**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| DEBRA LEBAKKEN, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| MH SUB I, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Debra Lebakken ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This is a class action suit brought on behalf of all persons who have accounts with Facebook and WebMD and who viewed videos on WebMD.com.

2.    MH Sub I, LLC ("Defendant" or "WebMD") develops, owns, and operates a popular website, WebMD.com, which offers "health information on the

internet."[1]   WebMD generates revenue "primarily through advertising and sponsored content for pharmaceutical, biotech, and medical device companies, as well as hospitals, health insurance providers, and lifestyle and wellness brands."[2] WebMD receives advertising revenue, at least in part, by leveraging its platform and the videos it features.   One products company, for example, marketed its antiperspirant by "creat[ing] videos about how to naturally mitigate the condition" and "distribut[ing] the videos on WebMD's site and across social media, using a custom audience of people who had researched sweating."[3]

3.     Plaintiff brings this action for damages and other legal and equitable remedies resulting from the illegal actions of Defendant knowingly disclosing personally identifiable information—including a record of every video clip viewed by the user—to unrelated third parties.

4.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any

---

[1] WEBMD, WHAT WE DO FOR OUR USERS, https://www.webmd.com/about-webmd-policies/about-what-we-do-for-our-users.

[2] Julia Belluz, *The truth about WebMD, a hypochondriac's nightmare and Big Pharma's dream*, VOX (Apr. 5, 2016), https://www.vox.com/2016/4/5/11358268/webmd-accuracy-trustworthy.

[3] Sarah Sluis, *WebMD Uses Data to Connect Sponsored Content To Customer Journeys*, ADEXCHANGER (Jan. 24, 2020), https://www.adexchanger.com/the-sell-sider/webmd-uses-data-to-connect-sponsored-content-to-customer-journeys/.

consumer of such provider."  18 U.S.C. § 2710(a)(4).  "Personally identifiable information" ("PII") is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

5.    The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

6.    Defendant violated the VPPA by knowingly transmitting Plaintiff's and the putative class's personally identifiable information to unrelated third parties.

## FACTUAL BACKGROUND

I.    **The VPPA**

7.    The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, who then published that history.  Congress responded by passing the VPPA, with an eye toward the digital future.  As Senator Patrick

Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

8.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

**II.      Facebook and The Facebook Pixel**

9.      Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[4]  Facebook describes itself as a "real identity platform,"[5] meaning users are allowed only one account and must share "the name they go by in everyday life."[6]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[7]

10.      Facebook generates revenue by selling advertising space on its website.[8]

11.      Facebook sells advertising space by highlighting its ability to target users.[9]  Facebook can target users so effectively because it surveils user activity both

---

[4] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html.

[5] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[6] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[7] FACEBOOK, SIGN UP, https://www.facebook.com/

[8] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[9] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

on and off its site.[10]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[11] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[12]

12.    Advertisers can also build "Custom Audiences."[13]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your

---

[10] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=12053766828321 42.

[11] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[12] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[13] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=24690979533764 94.

source audience to find new people who share similar qualities."[14]   Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[15] One such Business Tool is the Facebook Tracking Pixel.

13.   The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[16]   When the Facebook Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like Custom Audiences and Core Audiences.

---

[14] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[15] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[16] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

14.     Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect.  The Facebook Tracking Pixel can capture the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.[17]  Advertisers can also configure the Facebook Tracking Pixel to track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[18] Advertisers can also create their own tracking parameters by building a "custom event."[19]

15.     Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[20]   HTTP Headers collect "IP addresses,

---

[17] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[18] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[19] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[20] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

information about the web browser, page location, document, referrer and persons

using the website."[21]   Pixel-specific Data includes "the Pixel ID and cookie."[22]

## II.     WebMD And The Facebook Tracking Pixel

16.     WebMD hosts and delivers hundreds of videos, featuring them on its

homepage and embedding them into its articles.

17.     WebMD hosts the Facebook Tracking Pixel on its website and

transmits five distinct events to Facebook:[23]

**Figure 1**



18.     Three of the events—PageView, Button Click, and Microdata— reveal

what video a subscriber has watched.

---

[21] *Id.*

[22] *Id.*

[23] This data derives from a tool created and offered by Facebook.

19.    PageView   transmits   the   Universal   Resource   Locator   ("URL")

accessed:

**Figure 2**



20.    Microdata transmits the title and description of the video:

**Figure 3**



21.    Button Click registers every time a visitor clicks pause or play:

**Figure 4**



22.    The data from PageView, Microdata, and Button Click independently and jointly permit an ordinary person to identify a particular video's title and content.

23.    A visitor who is logged into Facebook while watching a video on WebMD will transmit the c_user cookie to Facebook.  The c_user cookie contains an unencrypted Facebook ID.  When accessing the above video, for example, eleven cookies were sent to Facebook, including the c_user cookie and corresponding Facebook ID:

**Figure 5**

| _fbp | fb.1.1642172799804.27... | .facebook.com |
|---|---|---|
| locale | en_US | .facebook.com |
| fr | 0pzkJ0KyCTCT4NFd8.A... | .facebook.com |
| xs | 22%3Ai_mjnOqjaC3Wo... | .facebook.com |
| c_user | 100035966074568 | .facebook.com |
| usida | eyJ2ZXIiOjEsImlkIjoiQXl... | .facebook.com |
| wd | 1836x906 | .facebook.com |
| datr | puvVYbIXaHVAAIbERd0... | .facebook.com |
| sb | vnjUYXzfkar3Y9up1wdkl... | .facebook.com |
| presence | C%7B%22t3%22%3A%5... | .facebook.com |
| spin | r.1004964303_b.trunk_t.... | .facebook.com |

24.     When a visitor's browser has recently logged out of Facebook, WebMD

will compel the browser to send a smaller set of cookies: [24]

**Figure 6**

| locale | en_US | .facebook.com |
|---|---|---|
| fr | 096zubEa5V33eYYSu.AWVt... | .facebook.com |
| wd | 958x927 | .facebook.com |
| datr | u1_5YcAvMdr0u50Ot7mglWqc | .facebook.com |
| sb | aE_5YeNYWNmYwsOT1IuY-u... | .facebook.com |

25.     The fr cookie contains, at least, an encrypted Facebook ID and browser

identifier.[25]   The _fbp cookie contains, at least, an unencrypted value that uniquely

---

[24] Figures 5 and 6 omit a duplicate _fbp cookie that is sent as a first-party cookie.

[25] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-
AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

identifies a browser.[26]  The datr cookies also identifies a browser.[27]  Facebook, at a minimum, uses the fr and _fbp cookies to identify users.[28]

26.    If a visitor has never created a Facebook account, three cookies are transmitted, two of which are visible here:

**Figure 7**

| fr | 0dAoWIXiw3haahKjT..BiApy... | .facebook.com |
|----|------------------------------|---------------|
| sb | IJwCYtyFD-DWJjfFw3Cwlm98 | .facebook.com |

27.    Missing from the above images is the "_fbp cookie," which WebMD compels a browser to send in all three instances:

**Figure 8**

| _fbp | fb.1.1644338319874.31078845 | .webmd.com |
|------|------------------------------|------------|

28.    Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.  Facebook uses both for targeted advertising.[29]

---

[26] FACEBOOK, CONVERSION API, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.

[27] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[28] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[29] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies

29.     The fr cookie will expire after 90 days unless the visitor's browser logs back into Facebook.[30]  If that happens, the time resets, and another 90 days begins to accrue.[31]

30.     The _fbp cookie will expire after 90 days unless the visitor's browser accesses the same website.[32]  If that happens, the time resets, and another 90 days begins to accrue.[33]

31.     The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, WebMD.[34] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[35]   The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a

---

[30] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[31] Confirmable through developer tools.

[32] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[33] Also confirmable through developer tools.

[34] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[35] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

third-party cookie, depending on whether the browser has recently logged into Facebook.

32. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

33. The Facebook ID is personally identifiable information. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com/.

34. WebMD also uses "Automatic Matching for Partner Integrations":

**Figure 9**

```
fbq.registerPlugin("428750600651790", {__fbEventsPlugin: 1, plugin: function(fbq, instance, config)
fbq.loadPlugin("identity");
instance.optIn("428750600651790", "InferredEvents", true);
fbq.loadPlugin("json1d_microdata");
instance.optIn("428750600651790", "MicrodataJsonLd", true);
fbq.loadPlugin("iwlbootstrapper");
instance.optIn("428750600651790", "IWLBootstrapper", true);
fbq.loadPlugin("iwlparameters");
fbq.loadPlugin("inferredevents");
instance.optIn("428750600651790", "IWLParameters", true);
fbq.set("iwlExtractors", "428750600651790", []);
fbq.loadPlugin("cookie");
instance.optIn("428750600651790", "FirstPartyCookies", true);
fbq.loadPlugin("inferredevents");
fbq.loadPlugin("microdata");
fbq.loadPlugin("identity");
instance.optIn("428750600651790", "AutomaticSetup", true);
fbq.loadPlugin("automaticmatchingforpartnerintegrations");
instance.optIn("428750600651790", "AutomaticMatchingForPartnerIntegrations", true);
```

35. "Partners Integrations" means WebMD employs another third-party to "install Meta Business Tools."[36]  Automatic Matching means WebMD configures

---

[36] FACEBOOK, ABOUT FACEBOOK PARTNER INTEGRATIONS, https://www.facebook.com/business/help/1179210765468894?id=1205376682832 142

its Pixel to "look for recognizable form field and other sources on your website that contain information such as first name, last name and email." [37]  The Facebook Tracking Pixel's code will collect that information, "along with the event, or action, that took place." [38]  This information is "hashed," [39] meaning it is "[a] computed summary of digital data that is a one-way process." [40]  In other words, it "cannot be reversed back into the original data." [41]

36.    WebMD discloses this information so it can better match visitors to their Facebook profiles, thereby allowing WebMD to better target its advertisements:

---

[37] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=12053766828321 42

[38] *Id.*

[39] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash

[40] *Id.*

[41] *Id.*

**Figure 10**

You can use Advanced Matching to help:

- Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.

- Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.

- Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

37.    When first subscribing, WebMD contains a form field for email:

**Figure 11**



38.     When subscribers enter their email into that form field, WebMD's Pixel transmits this information to Facebook.  When subscribers later navigate WebMD, the Facebook Tracking Pixel will transmit this identifier alongside the event data previously shown.  The email address enables the social media site to match that event data with a Facebook profile.

39.     WebMD knows Facebook will match the Automatic Matching parameters with a subscriber's subsequent activity, thereby helping WebMD "[i]ncrease the number of attributed conversions," "[i]ncrease [its] Custom Audience size," and "[d]ecrease the cost per conversion."[42]

40.     By compelling a visitor's browser to disclose the Advanced Matching parameters alongside event data for videos, WebMD knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

41.     By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, WebMD knowingly discloses information

---

[42] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=12053766828321 42.

sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

42.    By compelling a visitor's browser to disclose the fr and _fbp cookies alongside event data for videos, WebMD knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

43.    Facebook confirms it matches activity on WebMD with a subscriber's profile.  Facebook allows users to download their "Off-Facebook activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting their apps or websites."[43]  Here, that report confirms WebMD discloses an individual's video-viewing history:

---

[43] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627

**Figure 13**



44.     The "ID" shown here matches the Facebook Pixel ID visible in the first image.  The Facebook Pixel ID is a numerical code that uniquely identifies each Pixel.[44]  In practice, this means WebMD's Facebook Tracking Pixel has a Pixel ID that differs from all other websites.  All subscribers who view videos on WebMD's website can pull their off-site activity report and see the same Pixel ID.

45.     Individuals can subscribe to WebMD by clicking on the "subscribe" button:

**Figure 14**



---

[44] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

46.     To subscribe, viewers must input their email address.  *See* Figure 11.

**III.    Experience of Plaintiff Debra Lebakken**

47.     In November 2017, Plaintiff Lebakken subscribed to WebMD. Plaintiff Lebakken also created an account with WebMD, which required her to submit her email, birthday, and a password.

48.     In 2007, Plaintiff Lebakken created a Facebook account.

49.     Plaintiff Lebakken frequently visits WebMD to, among other things, watch videos.

50.     When Plaintiff Lebakken watched videos on WebMD.com, Defendant disclosed her Facebook ID, email address, and other identifiers to Facebook.

51.     When Plaintiff Lebakken watched videos on WebMD.com, Defendant disclosed her event data, which includes the pages she viewed, the buttons she clicked, and metadata for the webpages she visited.  This event data sufficiently identified the video's title, subject, tags, and URL, along with when Ms. Lebakken paused and played the video.  Prior to disclosure, WebMD's Pixel combined this event data with Ms. Lebakken's identifiers, which it then transmitted to Facebook.

52.     Plaintiff Lebakken discovered WebMD surreptitiously collected and transmitted her personally identifiable information in January 2022.

## PARTIES

53.     Plaintiff Lebakken is, and has been at all relevant times, a resident of Edgerton, Kansas and has an intent to remain there, and is therefore a domiciliary of Kansas.

54.     Defendant MH Sub I, LLC is a Delaware corporation.  Defendant develops, owns, and operates WebMD.com, which is used throughout Georgia and the United States.

55.     The operative contract between Plaintiff and Defendant, executed in November 2017, includes a forum selection clause, designating, and consenting to the jurisdiction of, this District as the appropriate venue for lawsuits arising out of the contract.

## JURISDICTION AND VENUE

56.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States (the VPPA).

57.     This Court has personal jurisdiction over Defendant because Defendant and Plaintiff contractually assented to this District's exercise of jurisdiction.

58.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## CLASS ACTION ALLEGATIONS

59.     **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have a Facebook account, subscribed to WebMD, and viewed videos on WebMD's website. (the "Class").

60.     Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

61.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

62.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the

Class that predominate over questions that may affect individual members of the Class include:

> (a)    whether Defendant collected Plaintiff's and the Class's PII;
>
> (b)    whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;
>
> (c)    whether Defendant's disclosures were committed knowingly; and
>
> (d)    whether Defendant disclosed Plaintiff's and the Class's PII without consent.

63.    **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used WebMD's website to watch videos, and had her PII collected and disclosed by Defendant.

64.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring.   Plaintiff and her counsel are committed to vigorously prosecuting this class action.   Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.   Neither Plaintiff nor her counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class.   Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by members of the Class and will vigorously pursue

those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

65.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
## VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
## 18 U.S.C. § 2710, *et seq.*

66.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

67.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

68.     Defendant is a "video tape service provider" because it disseminates hundreds of videos on its website and thus "engag[es] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

69.     Plaintiff and members of the Class are "consumers" because they subscribed to WebMD.  18 U.S.C. § 2710(a)(1).

70.     Plaintiff and the Class members viewed video clips using WebMD's website.

71.     WebMD knowingly disclosed Plaintiff's PII because it used that data to build audiences on Facebook and retarget them for their advertising campaigns.

72.     Nor were Defendant's disclosures made in the "ordinary course of business" as the VPPA defines that term.  In particular, WebMD's disclosures to

Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

73.     On behalf of herself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at

trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys'

fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all

issues so triable.

Dated: February 15, 2022                Respectfully submitted,

**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C**.

*/s/ Alyssa Baskam*
**Alyssa Baskam (GA Bar No. 776157)**
**H. Clay Barnett, III***
Overlook II
2839 Paces Ferry Road SE, Suite 400
Atlanta, Georgia 30339
Alyssa.Baskam@beasleyallen.com
Clay.Barnett@beasleyallen.com

W. Daniel "Dee" Miles, III*
J. Mitch Williams*
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104

T: 334-269-2343
Dee.Miles@Beasleyallen.com
Mitch.Williams@Beasleyallen.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
888 Seventh Avenue
New York, NY 10019
T: (646) 837-7150 / F:(212) 989-9163
jarisohn@bursor.com
pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
T:(305) 330-5512 / F:(305) 679-9006
creilly@bursor.com

*Attorneys for Plaintiff and the Putative
Class*
*Pro Hac Vice Application Forthcoming*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, in compliance with Local Rule 5.1(c), that the foregoing pleading has been prepared using 14-point Times New Roman font.

*/s/ Alyssa Baskam*
Alyssa Baskam
