**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| DEBRA LEBAKKEN, individually and on behalf of all others similarly situated, | |
| Plaintiff, | **MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| v. | CIVIL ACTION FILE NO.: 1:22-cv-0644-TWT |
| WEBMD, LLC, | |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...........................................................................................4

II.     FACTUAL BACKGROUND.......................................................................6

    A.      Lebakken's Newsletter Subscription.....................................................6

    B.      WebMD's Alleged use of the Facebook Pixel.....................................7

    C.      Plaintiff's Video Views .......................................................................8

III.    LEGAL STANDARD ...................................................................................9

IV.     ARGUMENT.................................................................................................9

    A.      Plaintiff is not a Consumer under the VPPA Because She Did
        Not Rent, Purchase, or Subscribe to Any Video Service from
        WebMD .............................................................................................10

        1.      Plaintiff is not a "subscriber" under the VPPA. .....................10

        2.      Plaintiff is not a subscriber of a video service ........................12

    B.      Plaintiff Failed to Allege Facts Sufficient to Suggest that
        WebMD Shared Her Personally Identifiable Information in
        Connection with Video Views. .........................................................16

        1.      Plaintiff fails to allege that her e-mail or Facebook ID
            was transmitted to Facebook....................................................16

        2.      Plaintiff fails to allege that WebMD disclosed any
            Facebook IDs. ..........................................................................17

        3.      Browser information is not PII .................................................18

    C.      Plaintiff Fails to Adequately Plead Any Alleged Disclosure
        Was Made Knowingly........................................................................19

V.      CONCLUSION............................................................................................21

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................6

*Austin-Spearman v. AMC Network Entertainment LLC*,
    98 F. Supp.3d 662 (S.D.N.Y. 2015) ..........................................7, 9, 10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................6

*Costanzo v. City of Omaha*,
    No. 8:04CV99, 2004 WL 2359722 (D. Neb. Oct. 19, 2004) ............................12

*Ellis v. Cartoon Network*,
    803 F.3d 1251 (11th Cir. 2015) ...............................................7, 8, 10

*In re Hulu Priv. Litig.*,
    No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014)............15, 16

*In re Hulu Privacy Litigation*,
    86 F.Supp.3d 1090 (N.D. Cal. 2015)...........................................16, 17

*Mollett v. Netflix, Inc.*,
    Case No. 5:11–CV–01629–EJD, 2012 WL 3731542 (N.D. Cal.
    Aug.17, 2012) ...................................................................16

*In re Nickelodeon Consumer Privacy Litigation*,
    827 F.3d 262 (3d Cir. 2016) ....................................................12, 15

*Papasan v. Allain*,
    478 U.S. 265 (1986)...............................................................6

*Perry v. Cable News Network, Inc.*,
    854 F.3d 1336 (11th Cir. 2017) ...............................................8, 10, 11

*Robinson v. Disney Online*,
    152 F. Supp. 3d 176 (S.D.N.Y. 2015) ...........................................13

*Yershov v. Gannett Satellite Information Network, Inc.*,
    104 F. Supp. 3d 135 (D. Mass. 2015).............................................8

**STATUTES, RULES & REGULATIONS**

18 U.S.C. § 2710(a)(1)............................................................................................7

18 U.S.C. § 2710(a)(3)......................................................................................13, 16

18 U.S.C. § 2710(a)(4)............................................................................................7

18 U.S.C. § 2710(b)(1)............................................................................................6

18 U.S.C. § 2710(b)(2)(B).....................................................................................16

Fed. R. Civ. P. 12(b)(6)......................................................................................1, 3

Defendant WebMD, LLC ("WebMD"), by and through its undersigned counsel, respectfully moves to dismiss Plaintiff Debra Lebakken's ("Plaintiff") First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. WebMD submits the following arguments in support of this Motion and requests that the Court enter an order dismissing the First Amended Complaint with prejudice.

## I.  <u>Introduction</u>

This is one of more than a dozen Video Privacy Protection Act ("VPPA") class actions plaintiff's counsel and other members of the plaintiffs' bar have filed in recent months in federal courts across the country.  Challenging online content providers' use of the Facebook Pixel, a piece of code installed on their websites, these actions seek to multiply the VPPA's $2,500 in statutory damages by a putative nationwide class.  This is the only such action within the Eleventh Circuit, which has twice affirmed the dismissal of similar claims.

In 2017, Debra Lebakken subscribed to a free e-mail newsletter on WebMD.com, an online publisher of health news and information.  Over four years later, in January 2022, Lebakken navigated to WebMD.com and watched unspecified videos.  She does not allege that she accessed the videos through the newsletter, that she signed into the site, or that the videos were restricted to

newsletter subscribers or accountholders.  However, she alleges that by virtue of her email subscription, she is a "subscriber" within the meaning of the VPPA.

Lebakken alleges that the Facebook Pixel transmits video viewing information to Facebook.  According to Plaintiff, the Pixel also causes a user's browser to transmit certain other information, the specifics of which depend on whether a user is a Facebook accountholder, whether she is logged in to her Facebook account, whether she has recently logged out of her account, and whether she has cleared her browser's cookies.  A Facebook accountholder allegedly can confirm that her information has been collected through a given Pixel on Facebook's website.

Although Lebakken alleges she is a Facebook accountholder, she does not allege that she was logged in to Facebook, had recently or long-ago logged out of Facebook, or had cleared her cookies; so it is unclear what, if any, identifying information was shared.  Nor does she purport to have confirmed that WebMD's Pixel collected her information through her Facebook account.

Plaintiff failed to allege facts that could plausibly support a violation under the Act. First, she is not a "subscriber" within the meaning of the VPPA, and so cannot assert a claim.  Plaintiff's free newsletter subscription does not have the indicia of ongoing commitment necessary to establish that she is a "subscriber" under Eleventh Circuit precedent.  Nor is there a sufficient nexus between her

newsletter subscription and her video viewing on the website to bring any subscription within the reach of the statute.

Second, Plaintiff has failed to allege that her personally identifiable information ("PII") was disclosed in connection with her video views. Because she does not allege whether or when she logged into Facebook, she has not plausibly alleged that her Facebook ID was shared. And she has not alleged that WebMD ever had access to her Facebook ID such that it *could* share it. If she had not recently logged into Facebook, only a browser identifier was shared, which is not PII under the statute.

Finally, Plaintiff fails to allege facts sufficient to suggest that any disclosure of PII that may have occurred, was done knowingly.

For these reasons, the First Amended Complaint fails to state a claim upon which relief can be granted and should be dismissed with prejudice.

## II. Factual Background[1]

### A. Lebakken's Newsletter Subscription

Debra Lebakken is a frequent user of WebMD.com, a website operated by WebMD LLC that provides health information and news to the public. First Amended Complaint ("FAC") ¶¶ 2, 64. In November 2017, she provided her e-mail address and birthday to WebMD to sign up for an account and a free newsletter.

---

[1] Pursuant to Federal Rule of Civil Procedure 12(b)(6), WebMD takes the allegations of Plaintiff's Complaint as true only for the purposes of this motion.

FAC ¶ 62. She does not allege that she ever read the newsletter or logged into a WebMD account.

**B.     WebMD's Alleged use of the Facebook Pixel**

At some unspecified point, WebMD began to host the Facebook Pixel on its website to better serve ads to its users.  FAC ¶ 24. According to Plaintiff, the Pixel shares video viewing information with Facebook. *Id.* ¶¶ 24-29. The Pixel also causes certain information to be transmitted to Facebook, the specifics of which depend on the website user's interactions with Facebook:

- First, if a user is signed into Facebook, the Pixel purportedly prompts her browser to send data from a c_user cookie, a cookie installed by Facebook, back to Facebook. *Id.* ¶ 30.  This data includes an unencrypted Facebook ID. *Id.*

- Second, if a user has recently logged out of Facebook, the Pixel purportedly prompts her browser to send an encrypted Facebook ID and browser identifier via the fr_cookie to Facebook. *Id.* ¶¶ 32-32.The fr_cookie expires after 90 days unless renewed. *Id.* ¶ 36.

- Third, if a user does not have a Facebook account, the Pixel purportedly sends a browser identifier via a different combination of cookies. *Id.* ¶¶ 32-33.

Plaintiff does not allege what happens if a user logged out of her Facebook account months ago or never previously logged into her account on that device or

browser. Nor does she address what happens if a user clears her cookie cache or directs Facebook to restrict its use of information through privacy settings.

Plaintiff's allegations focus on Facebook, but she fails to give any clear indication as to the role of WebMD or its newsletter in these same allegations. Lebakken alleges that when a user subscribes to the WebMD newsletter, the Pixel causes her email address to be transmitted to Facebook.  She also alleges that WebMD broadly shares customer lists with Facebook.  However, she does not allege that either is disclosed in connection with video viewing information.

### C.     Plaintiff's Video Views

In January 2022, Plaintiff navigated to WebMD.com and viewed several videos.  She does not allege that she accessed these videos through a newsletter, that she was logged into a WebMD account, or that the videos were restricted to registered users.  And although she is a Facebook accountholder, she does not allege whether she was logged into Facebook, had recently logged out, had cleared her cookie history, or had adjusted her Facebook privacy settings.  Lebakken alleges that any Facebook user may determine whether specific Pixels gathered information pertaining to them, but she does not state that she has done so.  Despite extremely detailed allegations regarding the capability of the Pixel and the types of  cookies it shares under various factual circumstances, with respect to her own experience, she conclusorily alleges, "When Plaintiff Lebakken watched videos on WebMD.com,

Defendant disclosed her Facebook ID, email address, and other identifiers to Facebook." *Id.* ¶ 65.

## III.   **Legal Standard**

To withstand a motion to dismiss, a complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests," as well as plausibly allege facts supporting a claim for which relief may be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The standard promulgated in *Twombly* and *Iqbal* requires that a complaint must do more than merely contain "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555–56. Courts must view the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true, but courts are not obligated to accept "a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. 544, 555 (quoting *Papasan v. Allain,* 478 U.S. 265, 286 (1986)).

## IV.   **Argument**

To plead a violation of the Video Privacy Protection Act ("VPPA"), a plaintiff must allege: (1) she is a consumer under the statute, (2) the defendant is a video tape service provider, (3) who disclosed the plaintiff's personally identifiable information ("PII"), (4) and did so knowingly. 18 U.S.C. § 2710(b)(1). Plaintiff failed to

adequately allege that she is a consumer under the statute, that any PII was actually disclosed, and—if any PII was disclosed—that WebMD knowingly caused that disclosure.  Therefore, her claim must be dismissed.

### A.    Plaintiff is not a Consumer under the VPPA Because She Did Not Rent, Purchase, or Subscribe to Any Video Service from WebMD

Plaintiff must be a "consumer" to state a VPPA claim. A consumer is a "renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). "Video tape service provider" is further defined as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Plaintiff does not allege that she rented or purchased anything from WebMD. Thus, she must sufficiently allege that she is a "subscriber."  She did not.

### 1.    Plaintiff is not a "subscriber" under the VPPA.

The Eleventh Circuit has interpreted the meaning of "subscriber" as requiring "some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." *Ellis v. Cartoon Network*, 803 F.3d 1251, 1256 (11th Cir. 2015); *see also Austin-Spearman v. AMC Network Entertainment LLC*, 98 F. Supp.3d 662, 669 (S.D.N.Y. 2015) ("[W]hat remains is the subscriber's deliberate and durable affiliation with the provider . . . these arrangements necessarily require some sort of ongoing relationship between provider and subscriber.").  While "payment is not a necessary element of subscription," it is "one factor a court should

consider when determining whether an individual is a 'subscriber' under the VPPA."
*Ellis* 803 F.3d at 1256.  Other factors to consider are "registration, commitment,
delivery, [expressed association,] and/or access to restricted content."  *Id.* (alteration
in original) (quoting *Yershov v. Gannett Satellite Information Network, Inc.*, 104 F.
Supp. 3d 135, 147 (D. Mass. 2015)).

In *Ellis*, the court found no ongoing commitment or relationship between the
plaintiff and defendant Cartoon Network when the plaintiff downloaded the free
Cartoon Network app and viewed video clips on it. *Ellis*, 803 F.3d at 1257. "[S]imply
downloading an app for free and using it to view content at no cost" was insufficient
"to make a user of the app a 'subscriber[.]'" *Id.*  The ability of the plaintiff to at any
time delete the Cartoon Network app and "never access its content again" led the
court to conclude that the requisite ongoing commitment did not exist between the
parties. *Ellis*, 803 F.3d at 1257.

The Eleventh Circuit reiterated that holding in *Perry v. Cable News Network,
Inc.*, 854 F.3d 1336, 1344 (11th Cir. 2017), stating "[T]he ephemeral investment and
commitment associated with [the] downloading of the [app] on his mobile
device…is simply not enough to consider [plaintiff] a 'subscriber.'"

Like the plaintiffs in *Ellis* and *Perry*, Plaintiff here has only viewed free video
clips on a publicly accessible forum. While Plaintiff submitted her email address in
order to receive a free newsletter, this is less of an "ongoing commitment" than

downloading an app, which remains on one's device until deletion. Thus, Plaintiff cannot show the requisite ongoing commitment tying her to WebMD. She is at any time free to unsubscribe and "never access [WebMD's] content again." She made no payments, does not allege whether she actually received delivery of the newsletter, and does not allege that the newsletter gave her access to any restricted content. Casual consumption of WebMD's free internet newsletter does not suffice to show the requisite "ongoing commitment or relationship" with WebMD. Thus, Plaintiff is not a "consumer" within the meaning of the VPPA and the claim should be dismissed.

### 2.    Plaintiff is not a subscriber of a video service.

Even if Plaintiff adequately alleged that she was a "subscriber"—and she has not—Plaintiff has not alleged that she subscribed to a *video* service.

The facts in this case are remarkably similar to those alleged in *Austin-Spearman*. *See Austin-Spearman v. AMC Network Entertainment LLC*, 98 F. Supp.3d 662, 669 (S.D.N.Y. 2015). In an initial pleading, the *Austin-Spearman* plaintiff alleged that she watched videos on AMC's website related to the *Walking Dead*. *Id.* at 664, 671. The court found this fall short of subscription, with the court holding that "an individual must do more than simply take advantage of a provided service" in order be to a subscriber under the VPPA. *Id.* at 671. The plaintiff argued that she should be permitted leave to amend to allege that she had registered and

provided her email address for AMC's *Walking Dead* newsletter. *Id.* The court reluctantly granted leave to amend, remarking that it "remain[ed] skeptical that Austin-Spearman will be able to state a claim even after amendment" and noting that the proposed amendment raised "troubling questions and implications" as to "whether a plaintiff can constitute a subscriber under the VPPA if she subscribes only to a portion of the provider's services that are distinct and set apart from its provision of videos." *Id.*

Although neither *Ellis* nor *Perry* directly addressed this question, they opinions suggest the answer is no. The Eleventh Circuit in *Ellis* expressly agreed with the *Austin-Spearman* court, finding, "[W]e generally agree with the approach and result of *Austin-Spearman*—the case held that a person who visited the free website of a cable television network to watch videos was not a 'subscriber' of the network under the VPPA." *Ellis*, 803 F.3d at 1257-58 (taking issue only with the *Austin-Spearman* court's agreement with the district court's reasoning in *Ellis*).

*Perry* more directly grappled with an allegation seeking to shoehorn a "subscription" into an otherwise uncognizable claim. The plaintiff in *Perry* had alleged that he downloaded and watched videos on the free CNN App, which sent his viewing history to a third party. In response to *Ellis*, the plaintiff in *Perry* had sought to amend his claim to allege that he had access to exclusive content on the CNN App by virtue of his cable television subscription and that through that

subscription, he made indirect payments to CNN. *Perry,* 854 F.3d at 1341. The district court denied the amendment as futile and the Eleventh Circuit affirmed. *Id.* at 1341-42.

The *Perry* court reasoned that the restricted content was viewable to plaintiff by virtue of his relationship with his television provider, not his relationship with CNN. *Id.* at 1343. The court noted that other than downloading the app and acknowledging his cable subscription, "there is no indication that Perry has engaged CNN in any other way in order to gain access to this exclusive feature." *Id.* Moreover, the plaintiff "did not actively provide his personal information to CNN in exchange for the CNN App." *Id.* In other words, although the plaintiff in *Perry* alleged that content was restricted and he made payments to access it, the Eleventh Circuit found he was not a subscriber because there was not a sufficient connection between the restricted content and the payments or commitments made. *Id.* at 1344.

Here, there is a similar lack of connection in the allegations. Lebakken claims she provided her email address on WebMD's website in 2017 when she signed up for a free electronic newsletter. FAC ¶¶ 62, 47. While she alleges that WebMD "frequently features its video content through its email newsletter," *id.* ¶ 56, she does not allege that it did so in 2017 when she signed up, that she ever accessed any videos featured in the newsletter, or that the videos were solely accessible through the newsletter. Indeed, Plaintiff is conspicuous in her failure to allege that when she

viewed videos in January 2022, she accessed those videos through the newsletter, that she was signed into the website, or that the video was restricted to accountholders. Rather, the FAC makes clear that the email newsletter is distinct from WebMD's website, which provides publicly accessible videos and other content regardless of whether the viewer has signed up for the newsletter or otherwise created an account. *Id. passim.*

The legislative history behind the VPPA further supports the interpretation that subscription to a *video* service is required to make one a consumer within the VPPA's purview. Congress's passage of the VPPA was motivated by the leak of then-Supreme Court nominee Robert Bork's rental history from a brick-and-mortar video store. S. REP. 100-599 at *5; *see also In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 284 (3d Cir. 2016) ("We do not think that, when Congress passed the Act, it intended for the law to cover factual circumstances far removed from those that motivated its passage."). The narrow intent behind the VPPA was to monitor video rental stores, not providers that engage only in incidental video content creation. *See Costanzo v. City of Omaha*, No. 8:04CV99, 2004 WL 2359722, at *2 (D. Neb. Oct. 19, 2004) (finding that the VPPA is limited in its application to "private video stores"). Had Congress intended for the VPPA to cover providers of written materials such as email newsletters, it easily could have extended it to do so, but they did not. *See* S. REP. 100-599 at *11-12 ("[S]imply because a business is

engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill.").

Because Lebakken's video viewing was unrelated to her email subscription, she was not a subscriber of a video service and her claim is not within the scope of the VPPA.

**B.    Plaintiff Failed to Allege Facts Sufficient to Suggest that WebMD Shared Her Personally Identifiable Information in Connection with Video Views.**

The VPPA defines PII as to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). To plead a violation of the VPPA, Plaintiff is required to allege that WebMD disclosed information that "identif[ies] a particular person—not just an anonymous individual—and connect[s] this particular person with his or her viewing history." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015).

**1.    Plaintiff fails to allege that her e-mail or Facebook ID was transmitted to Facebook.**

First, Plaintiff alleges that the Pixel transmits emails to Facebook when a user subscribes to the newsletter.  FAC ¶ 45.  However, she does not, and cannot, allege that this email address is transmitted together with video viewing information.  She does not, and cannot, allege that WebMD had the Pixel on its website when she subscribed in 2017.  Therefore, she has not adequately alleged that her email address

was transmitted to Facebook, much less that it was transmitted in such a way that would connect it to her video views.

Second, Plaintiff alleges that a WebMD visitor who watches a video while logged into Facebook transmits a specific c_user cookie to Facebook, which allegedly contains an "unencrypted Facebook ID." FAC ¶ 30. However, while Plaintiff alleges she signed up for Facebook in 2007, FAC ¶ 63, she does not allege that she was logged into Facebook while she viewed videos on WebMD.com in January 2022. Therefore, she does not allege facts sufficient to suggest that her unencrypted Facebook ID was transmitted in connection with her video viewing history.

Third, Plaintiff alleges that when a WebMD user who recently logged out of Facebook watches a video, the Pixel causes the fr_cookie, including an encrypted Facebook ID and browser information to be transmitted to Facebook. FAC ¶¶ 31-38. However, Plaintiff does not allege that she recently logged out of Facebook when she viewed videos on WebMD.com. Thus, she has not sufficiently alleged that her encrypted Facebook ID was sent to Facebook.

### 2. Plaintiff fails to allege that WebMD disclosed any Facebook IDs.

Plaintiff alleges that the information in two cookies that contained Facebook IDs (c_user and fr_cookies) were sent back to Facebook, but she does not allege that WebMD itself ever obtained the information in the cookies or otherwise knew site

users' Facebook IDs.  In other words, any disclosure of Facebook IDs was between Plaintiff and Facebook, not between WebMD and Facebook.[2]

### 3.    Browser information is not PII.

Plaintiff alleges that if a website user is not a Facebook accountholder, her browser transmits the _fbp cookie to Facebook, which identifies a browser. Although she does not address these scenarios, this would logically also be the case if the user had recently cleared her browser's cookies or had logged out of Facebook more than 90 days prior.  *See* FAC ¶ 36 (explaining the fr_cookie expires after 90 days).  However, Plaintiff does not explain how a browser identifier could be used to identify a person.  Therefore, she has not sufficiently alleged how browser information could transform into PII.  *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 283 (3d Cir. 2016) (holding after analysis of statutory history that a static personal identifier such as an IP address is not PII under the VPPA); *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person.").

---

[2] WebMD's lack of knowledge about who was viewing its video content suggests that it could not have "knowingly" made any disclosures of PII, as required by the statute.

### C.    Plaintiff Fails to Adequately Plead Any Alleged Disclosure Was Made Knowingly.

Plaintiff has also failed to adequately plead that any alleged disclosure of PII was made knowingly.  18 U.S.C. §2710(b)(2)(B).  To satisfy the statute, Plaintiff must "allege facts giving rise to a reasonable inference" that WebMD knowingly disclosed PII to a third party.  *Mollett v. Netflix, Inc.*, Case No. 5:11–CV–01629–EJD, 2012 WL 3731542 at *4 (N.D. Cal. Aug.17, 2012).  "Knowingly" connotes actual knowledge, meaning a defendant must be consciously aware not only that it is transmitting code, but that the code communicates private information.  *In re Hulu Privacy Litigation*, 86 F.Supp.3d 1090, 1095 (N.D. Cal. 2015).  A defendant's transmission of such data must be the equivalent of knowingly identifying a specific person as "having requested or obtained specific video materials or services."  *See* 18 U.S.C. §2710(a)(3).  Sending user identity and video material identity separately, even if simultaneously, does not necessarily create a sufficient connection to identify a user.  *In re Hulu*, 86 F.Supp.3d at 1096.

In *In re Hulu*, defendant Hulu added Facebook "Like" buttons to videos on its website.  *Id.* at 1093.  Whenever a user loaded a video watch page, the button would send the name of the video to Facebook.  *Id.*  If a user was logged into Facebook, the button would also send a c_user cookie, containing a numeric Facebook ID, to Facebook.  *Id.* at 1093-94.  These transmissions allowed Facebook to link the user's identity and video choices to other information about the user.  *Id.* at 1094.  However,

there were no facts suggesting that Hulu knew that Facebook might combine a user's identity with the name of the video they watched. *Id.* at 1097. Because Hulu did not know that Facebook might combine the two distinct pieces of data to identify a specific user as having requested a specific video, the court found that it did not knowingly disclose PII. *Id.* at 1099.

Here, Lebakken has alleged that both video information and identity information are shared with Facebook, but she has not alleged facts suggesting that WebMD knew that this information would be combined. Indeed, as discussed above, she has not alleged facts suggesting that WebMD itself knew the Facebook IDs that it purportedly disclosed. According to Plaintiff's allegations, the c_user and fr_cookies containing Facebook IDs were transmitted by users' browsers to Facebook, not by or to WebMD. *See* FAC ¶¶ 30, 47. While she alleges that WebMD sought to serve ads to those who would be interested in them (*e.g.*, ads for antiperspirant to those researching excessive sweating), *id.* ¶¶ 2, 14, she does not allege facts suggesting that WebMD targeted specific users or knew that data sent to Facebook could identify specific subscribers in connection with videos they watched. Rather, she alleges that Facebook "processes [the data], analyzes it, and assimilates it into datasets." *Id.* ¶ 20. This allegation suggests that what was visible to WebMD was aggregate data in a dataset, not any specific information about a specific person.

Plaintiff has failed to plead facts giving rise to a reasonable inference that Defendant consciously identified specific users as having watched specific videos. Therefore, even if the Court determines the transmitted information was PII (it was not), the Court should find that Defendant did not know it was disclosing PII.

## V.    **Conclusion**

For the foregoing reasons, the Court should dismiss the First Amended Complaint against WebMD with prejudice.

Dated:  July 15, 2022

By: */s/ Zoë K. Wilhelm*
    ZOË K. WILHELM
    FAEGRE DRINKER BIDDLE &
    REATH LLP

By: */s/ Jefferson M. Starr*
    JEFFERSON M. STARR
    Georgia Bar No.:  992352
    LUEDER, LARKIN & HUNTER, LLC
    3535 Piedmont Road
    Building 14, Suite 205
    Atlanta, GA 30305
    Telephone: 404-480-4028
    Email: jstarr@luederlaw.com
    *Attorneys for WebMD LLC*

## **CERTIFICATION OF COMPLIANCE**

The Undersigned Counsel hereby certifies that the foregoing has been prepared using Times New Roman 14-Point Font, as approved in LR 5.1C.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served this 15th day of July, 2022, upon all attorneys to this matter by filing with the Court's CM/ECF system, which will automatically e-mail notification of same to all counsel of record.

Dated:  July 15, 2022

By: */s/ Zoë K. Wilhelm*
    ZOË K. WILHELM
    FAEGRE DRINKER BIDDLE &
    REATH LLP

By: */s/ Jefferson M. Starr*
    JEFFERSON M. STARR
    Georgia Bar No.:  992352
    LUEDER, LARKIN & HUNTER, LLC
    3535 Piedmont Road
    Building 14, Suite 205
    Atlanta, GA 30305
    Telephone: 404-480-4028
    Email: jstarr@luederlaw.com
    *Attorneys for WebMD LLC*