## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| LINDA M. JANCIK, individually and on behalf of all others similarly situated, | CIVIL ACTION |
| Plaintiff, | FILE NO.: 1:22-cv-00644-TWT |
| v. | |
| WEBMD, LLC, | |
| Defendant. | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR CLASS <u>CERTIFICATION</u>

# **TABLE OF CONTENTS**

**PAGE(S)**

INTRODUCTION ........................................................................................1

SUMMARY OF COMMON FACTS ...........................................................1

LEGAL STANDARD.................................................................................9

ARGUMENT ...........................................................................................11

I.      THE CLASS AND SUBCLASS ARE ASCERTAINABLE........................11

II.     THE PROPOSED CLASS AND SUBCLASS SATISFY THE RULE
        23(a) REQUIREMENTS ................................................................12

        A.      Numerosity ......................................................................12

        B.      Commonality ...................................................................14

        C.      Typicality........................................................................15

        D.      Adequacy .........................................................................16

III.    THE PROPOSED CLASS AND SUBCLASS SATISFY THE RULE
        23(b)(3) REQUIREMENTS ...........................................................17

        A.      PREDOMINANCE ...........................................................17

        B.      SUPERIORITY ................................................................18

IV.     THE PROPOSED CLASS AND SUBCLASS SATISFY RULE
        23(b)(2) ....................................................................................20

CONCLUSION ........................................................................................20

<u>**TABLE OF AUTHORITIES**</u>

**PAGE(S)**

**CASES**

*Allapattah Servs., Inc. v. Exxon Corp.*,
    333 F.3d 1248 (11th Cir. 2003)..............................................................18

*Armstrong v. Martin Marietta Corp.*,
    138 F.3d 1374 (11th Cir. 1998).............................................................10

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ..............................................................................10

*Cherry v. Dometic Corp.*,
    986 F.3d 1296 (11th Cir. 2021)................................................9, 11, 20

*Cordoba v. DIRECTV, LLC*,
    942 F.3d 1259 (11th Cir. 2019).............................................................17

*Cox v. American Cast Iron Pipe Co.*,
    784 F.2d 1546 (11th Cir. 1986).............................................................13

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ..............................................................................10

*Evans v. U.S. Pipe & Foundry Co.*,
    696 F.2d 925 (11th Cir. 1983)...............................................................13

*General Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ..............................................................................10

*Gilchrist v. Bolger*,
    733 F.2d 1551 (11th Cir. 1984).............................................................10

*Herrera v. JFK Med. Ctr. L.P.*,
    648 F. App'x 930 (11th Cir. 2016) .........................................................9

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
    999 F.3d 1247 (11th Cir. 2021).............................................................16

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
    571 F. Supp. 2d 1315 (N.D. Ga. 2007) ................................................16

*Kilgo v. Bowman Transp., Inc.*,
    789 F.2d 859 (11th Cir. 1986) ............................................................... 12

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ...................................................... 10, 19

*Mauldin v. Wal-Mart Stores, Inc.*,
    2002 WL 2022334 (N.D. Ga. Aug. 23, 2002) ...................................... 14

*Susan J. v. Riley*,
    254 F.R.D. 439 (M.D. Ala. 2008) ........................................................ 13

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ............................................................ 10

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ............................................................ 13

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................................... 10, 20

*Williams v. Mohawk Indus., Inc.*,
    568 F.3d 1350 (11th Cir. 2009) ............................................................ 15

**STATUTES**

18 U.S.C. § 2710 ................................................................................ 1, 7, 18

**RULES**

Fed. R. Civ. P. 23 ...............................................................................Passim

ii

## **INTRODUCTION**

This case raises one central question: did Defendant WebMD, LLC ("Defendant" or "WebMD") violate the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* ("VPPA") when, using computer code called the Facebook Tracking Pixel, it surreptitiously tracked consumers' video-watching behavior on webmd.com, and then shared that data with Meta Platforms, Inc.? That question will be answered the same way for everyone in the Class and Subclass because Defendant used the same technology in the same way and with the same result for everyone. And Defendant and Meta's own records can be used to identify members of the Class and Subclass; WebMD has a record of which users watched its videos, including through its newsletter, as well as their email addresses, and Meta can use those email addresses to find those users' Event Data. For these reasons, as explained more fully below, the Court should certify the proposed Class and Subclass, appoint Plaintiff Linda Jancik as class representative and appoint her attorneys as class counsel.

## **SUMMARY OF COMMON FACTS**

Defendant owns and operates webmd.com, a website that ███████████ ███████████████████████████████████████████████████████ Ex. 1

(Mario Dep.) at 21:21-23.[1]  Webmd.com provides content in various formats including ███████████████████████. *Id.* at 22:5-16. ████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ *Id.* at 23:13-27:7.

Because advertising revenue depends on views and clicks, driving traffic to webmd.com is essential for the health of Defendant's revenue stream.  Accordingly, WebMD ████████████████████████████████████████████████

████████████████ *Id.* at 47:14-19.  The benefit of advertising on Facebook in particular is it can target specific users, ████████████████████████████

████████████████████████████████████████████████

█████. *Id.* at 47:20-48:17.  But that kind of targeting is only possible because WebMD ████████████████████████████████████. *Id.* at 40:17-20 ("█

████████████████████████████████████████████████

████████████████████████"). 

The Facebook Tracking Pixel, also known as the Meta Pixel, is a "publicly available piece of code that third-party website developers [like WebMD] can choose to install and use on their websites to measure actions taken on their own websites."  Ex. 2 (Wooldridge Decl.) ¶ 3.  "Specifically, when someone takes an

---

[1] Unless otherwise indicated, all Exhibit ("Ex. ___") citations refer to exhibits contained within the Declaration of Joshua D. Arisohn ("Arisohn Decl."), filed herewith.

action a developer chooses to track on their website," like visiting a particular URL or watching a video, "the Meta Pixel is triggered and sends Meta certain data, called an 'Event.'" *Id.* ¶ 4. "Meta attempts to match the Events it receives to Meta users" so that website developers can create "Custom Audiences" to target those users with advertisements. *Id.* Meta accomplishes matching by collecting personally identifying information (such as name, email address and/or Facebook User IDs) ("PII") along with the Event Data. Exs. 19-20.

Defendant placed the code for the Facebook Tracking Pixel on its website, webmd.com, "as an initial pilot program in or about September 2015 and fully implemented the Pixel across the website in or about 2016." Ex. 3 (Interrogatory No. 8) at 16. The Pixel on webmd.com tracks various activities users take, including whether they have visited a particular URL dedicated to video content. Ex. 3 (Interrogatory No. 5) at 12. Those URLs clearly identify when a webpage contains a video and the nature of that video. *See, e.g.*, Ex. 4 (Meta Event Data) (███████ ████████████████████████████████████ ███████████); *see also* Ex. 3 (Interrogatory No. 5) at 12 ("The Facebook Pixel discloses to Facebook any url visited on webmd.com. With respect to videos, prior to June 15, 2022, the Facebook Pixel also disclosed video titles, button clicks (e.g., play or pause)."). That Event Data is then sent to Facebook, along with users' Facebook IDs and other PII where it is then matched to users' Facebook Accounts.

3

Ex. 4 (Meta Event Data) (█████████████████████████████████████

███████████████

Throughout the relevant time period, WebMD knew that the Facebook

Tracking Pixel ████████████████████████████████████████████████

██████████████████████████████████████ Ex. 1 (Mario Dep.) at

42:6-43:14 (█████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████); *id.* at 46:4-7 (███████████████████████████

████████████████████████████████████████████████████████████).

WebMD also consistently ███████████████████████████████. Ex. 5

(Strangfeld Dep.) at 143:25-144:5, 145:19-146:14 (████████████████

████████████████████████████████████████████████████████████

█████████████████████████).

WebMD has also known throughout the relevant time period that Facebook

was ██████████████████████████████████. Indeed, the entire

purpose of Defendant installing the Facebook Tracking Pixel on webmd.com in the

first place was so that it could ████████████████████████████████

████████████████████████████:

    Q.    ████████████████████████████████████████

          ████████████████████████████████

A. 

Ex. 1 (Mario Dep.) at 188:9-15; *id.* at 192:23-193:2 (

); *id.* at 73:10-15 (

); *id.* at 55:4-56:12

(

); Ex. 7 (noting the availability of using the Pixel for "exact match").  That necessarily included users' views of videos, which can be determined by the URLs themselves.

Other evidence confirms WebMD knew that the Pixel was tracking video-viewing data.  For instance, WebMD used a tool from Meta called the Facebook Pixel Helper that showed precisely which types of Event Data the Pixel was configured to track.  Exs. 21-22 (showing that WebMD used a tool called the Facebook Pixel Helper which displayed that it set up the Pixel to track PageViews and ViewContent events).  In addition, the video tracking that WebMD set up using the Pixel was a

. Ex. 9.

WebMD was also aware of Meta's numerous public webpages that explained in detail what the Facebook Tracking Pixel tracked.  Ex. 23 (explaining that the PageView ViewContent events track URLs); Ex. 5 (Strangfeld Dep.) at 24:11-20;

90:8-91:6 (███████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████). Exs. 19-20; Ex. 1

(Mario Dep.) at 173:14-175:3 (admitting ███████████████████████

████). WebMD even had ████████████████████████ to discuss

█████████████████████████████████████████████████

Ex. 1 (Mario Dep.) at 75:17-76:19.

    In addition to regular meetings, Facebook also reached out to WebMD

multiple times to alert WebMD that it was ███████████████████████

████████████. Ex. 34; Ex. 5 (Strangfeld Dep.) at 118:3-122:17. These messages

put WebMD on notice of the extent to which user data was being tracked by the

Pixel and shared with Meta. In further acknowledgement that the Facebook

Tracking Pixel can track what webpages individuals visit, WebMD even ██████

█████████████████████████████████████████████████████████████

█████████████████████████ *Id.* at 81:6-16 (████████████████████

█████████████████████████████████████████████). And

on or about March 18, 2020, WebMD ███████████████████████████████

████████████████████████ Ex. 30; Ex. 5 (Strangfeld Dep.) at 67:8-17;

70:8-24.   Nonetheless,  WebMD  continues  to  ████████████████████████

█████████████████ Ex. 21; Ex. 5 (Strangfeld Dep.) at 130:17-131:7.

But consumers do not consent to any of this tracking.  Ex. 6 (Jancik Decl.) ¶

4.  While Defendant contends that consumers provide consent through its Privacy

Policy, Cookie Policy and Advertising Policy, none of these documents mention the

Facebook Tracking Pixel, or disclose that users' video-watching data and PII will be

sent to Meta or any other third parties.  Ex. 1 (Mario Dep.) at 152:2-11; 162:14-

163:16; 170:16-171:10; Exs. 12-14.  Nor do any of these policies contain the specific

form of consent that the VPPA requires.  *See* 18 U.S.C. § 2710(b)(2).   And

WebMD's Rule 30(b)(6) witness admitted that users ████████████████████████

████████████████████████ Ex. 1 (Mario Dep.) at 135:2-18.

One of the consumers whom WebMD tracked was Plaintiff Linda Jancik.

Plaintiff Jancik has been subscribed to the WebMD e-mail newsletter since at least

2021.  She created an account on webmd.com to receive that newsletter using the

email address lmj7277@yahoo.com.  Ex. 6 (Jancik Decl.) ¶ 2; Ex. 8 (JANCIK

000001-54).  Plaintiff Jancik uses that same email address for her Facebook account.

Ex. 6 (Jancik Decl.) ¶ 5; *see also* Ex. 10, at 5.  Plaintiff Jancik has watched countless

videos on webmd.com.  Ex. 6 (Jancik Decl.) ¶ 3.  She accessed many of these videos

by clicking on links in the webmd.com email newsletter.  *Id.*  Unbeknownst to her,

when Plaintiff Jancik watched these videos on webmd.com, Defendant sent her video-watching data and personally identifying information ("PII") to Meta where it was matched with her Facebook account. *Id.* ¶ 4. This data transfer permitted Meta to see what videos Plaintiff Jancik had requested or obtained on webmd.com. An excerpt of this data produced by Meta is depicted below:



Ex. 4 (Meta Event Data).

WebMD's internal data also confirms that Ms. Jancik ███████████████

████████████████████████████████████████████████████████

Ex. 1 (Mario Dep.) at 260:9-17; Ex. 25 at 3 (Email Metrics tab, Row 31). WebMD acknowledges that ██████████████████████████████████████

████████████████████████████ Ex. 25 at Overview tab; Ex. 1 (Mario

Dep.) at 245:7-247:3 (████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 23(c)(1)(A) provides that a court must "[a]t an early practicable time after a person sues or is sued as a class representative . . . determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). There are four prerequisites to class certification as outlined in Rule 23(a):

(1)   the class is so numerous that joinder of all members is impracticable;

(2)   there are questions of law or fact common to the class;

(3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, before a district court considers whether a class satisfies the Rule 23(a) prerequisites, the class representative must show the proposed class is "adequately defined and clearly ascertainable." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) (citation omitted). Finally, the proposed class must also satisfy at least one of the alternative requirements in Rule 23(b), which, for purposes of this case, are found in subsection (b)(3). *See Herrera v. JFK Med. Ctr. L.P.*, 648 F. App'x 930, 933 (11th Cir. 2016). Subsection (b)(3)

applies when "[1] the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . [2] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added).

The party seeking class certification bears the burden of proving that these requirements are satisfied. *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). The decision to grant or deny class certification lies within the sound discretion of the district court. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004), abrogated in part on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1386 (11th Cir. 1998) (*en banc*). When considering the propriety of class certification, the court should not conduct a detailed evaluation of the merits of the suit. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). Nevertheless, the court must perform a "rigorous analysis" of the particular facts and arguments asserted in support of class certification. *Falcon*, 457 U.S. at 161; *Gilchrist v. Bolger*, 733 F.2d 1551, 1555 (11th Cir. 1984). Frequently, that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351-52 (2011).

# **ARGUMENT**

## I.   **THE CLASS AND SUBCLASS ARE ASCERTAINABLE**

The Eleventh Circuit has traditionally "collapsed class definition and ascertainability into one inquiry.  A class is inadequately defined if it is defined through vague or subjective criteria.  And without an adequate definition for a proposed class, a district court will be unable to ascertain who belongs in it." *Cherry*, 986 F.3d at 1302 (citations omitted).  Administrative feasibility, however, is not a precondition for certification because neither Eleventh Circuit precedent nor the text of Rule 23(a) necessarily require its proof.  *Id.* at 1302-04 (concluding that administrative feasibility may be considered "as part of the manageability criterion of Rule 23(b)(3)(D)" but that such a consideration is not required for certification under Rule 23).

Here, Plaintiff seeks to certify the following class (the "Class"):

> All persons in the United States who, from February 17, 2020 through the date on which class notice is disseminated, had the same email address associated with a subscription to webmd.com and a Facebook account, and for whom there is associated Event Data in the possession of Meta Platforms, Inc. showing their video-viewing behavior on webmd.com.

Alternatively, Plaintiff seeks to certify the following subclass (the "Subclass"):

> All persons in the United States who, from February 17, 2020 through the date on which class notice is disseminated, had the same email address associated with a newsletter subscription to webmd.com and a Facebook

11

> account, and for whom there is associated Event Data in
> the possession of Meta Platforms, Inc. showing their
> video-viewing behavior on webmd.com that was accessed
> through a webmd.com newsletter.

Each of the criterion in these definitions is objective in nature. Defendant knows exactly ███████████████████████████████████████████████████ ███████████████████ Ex. 25; Ex. 1 (Mario Dep.) at 246:19-25. It also knows which of its subscribers watched a video through its newsletters. Ex. 25. Likewise, whether someone had a Facebook account associated with that same email address at the time they watched a video is an objective fact that can easily be determined by cross-referencing Defendant's and Facebook's records. *Id.* (showing that Defendant identified ████████████████████████████). Likewise, whether Facebook received Event Data from WebMD related to the watching of a newsletter video and then matched that video to an account is an objective matter that can be determined through Facebook's records. Ex. 4 (Meta Event Data) (████████████ ██████████████████████████████████████████████). And, for the subclass, WebMD's records show whether that video was accessed through its newsletters. Ex. 25.

## II.    THE PROPOSED CLASS AND SUBCLASS SATISFY THE RULE 23(a) REQUIREMENTS

### A.    Numerosity

To satisfy the numerosity requirement, the Plaintiff must show that joinder of

all members of the putative class would be "impracticable." Fed. R. Civ. P. 23(a)(1). "Practicability of joinder depends on many factors, including, for example, the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion." *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986). "[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). Further, "[w]hen the exact number of class members cannot be ascertained, the court may make 'common sense assumption' to support a finding of numerosity." *Susan J. v. Riley*, 254 F.R.D. 439, 458 (M.D. Ala. 2008) (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983)). Nevertheless, "a plaintiff still bears the burden of making some showing, affording the district court the means to make a supported factual finding, that the class actually certified meets the numerosity requirement." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009).

Here, Defendant's records show that for the period between January 2021 through December 2022, ▮▮▮▮ unique email addresses of newsletter subscribers are associated with videos accessed on webmd.com (Ex. 25 at Overview Tab, Column H, Row 11), and ▮▮▮▮ unique email addresses are associated with videos accessed on webmd.com by clicking through newsletter links specifically. Ex. 25 at

Overview Tab, Column H, Row 23. WebMD's use of the Pixel means that it sent all of this data to Meta. Accordingly, the Class and Subclass contain well over 40 members and numerosity is satisfied.

### B. Commonality

The Rule 23(a) commonality prerequisite "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart*, 564 U.S. at 350 (quotation marks and citation omitted). That injury "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Moreover, "[w]hat matters to class certification is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quotation marks, alterations, and citations omitted). Finally, "even a single common question will" suffice to establish commonality. *Id.* at 359 (quotation marks, alterations, and citations omitted). Courts in the Eleventh Circuit, and this District, have held the commonality "requirement is generally considered very easy to satisfy because the 'threshold of "commonality" is not high.'" *Mauldin v. Wal-Mart Stores, Inc.*, 2002 WL 2022334, at *9 (N.D. Ga. Aug. 23, 2002) (internal citations omitted). In fact, "even when individual factual circumstances are present among the class members, 'the commonality requirement is satisfied where

it is alleged that the defendants have acted in a uniform manner with respect to the class.'" *Id*. (internal citations omitted).

Here, common issues exist to all class members.  These include: (1) whether WebMD used the Facebook Tracking Pixel on its website; (2) whether the Pixel on webmd.com disclosed video-watching behavior and PII to Facebook; and (3) whether class members consented to those disclosures.  In light of these common issues—and one would suffice—Plaintiff satisfies the commonality requirement.

### C.    Typicality

The Rule 23(a) typicality prerequisite requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

> The claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.  A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3). The typicality requirement may be satisfied despite substantial factual differences . . . when there is a strong similarity of legal theories.

*Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356-57 (11th Cir. 2009) (quotation marks and citations omitted).  The test for typicality is not a demanding one; "the critical inquiry is whether the class representative's claims have the same essential characteristics as those of the putative class.  If the claims arise from a similar course

of conduct and share the same legal theory, factual differences will not defeat typicality." *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1326 (N.D. Ga. 2007) (citations omitted).

Here, Plaintiff Jancik is a typical class member because, just like every other class member, she watched videos on webmd.com (including through WebMD's email newsletter) and WebMD disclosed her video-watching behavior and PII to Facebook using the Facebook Tracking Pixel.  Ex. 4 (Meta Event Data).  In other words, Plaintiff Jancik is in exactly the same shoes as all other members of the Class and Subclass, and there are no unique defenses that will apply to her claim.

### D.    Adequacy

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "To determine whether the adequacy requirement is met, [a court asks]: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."  *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1275 (11th Cir. 2021) (quotation marks and citation omitted).

Here, Plaintiff Jancik has demonstrated that she is an adequate class representative.  Ms. Jancik has retained competent counsel, assisted with her counsel's investigation, reviewed and authorized the filing of legal documents,

responded to discovery, and she has kept in regular contact with her counsel to discuss the case. Ex. 6 (Jancik Decl.) ¶ 7. She has sat for a deposition and is willing to attend a trial. *Id.* ¶¶ 7-8. Plaintiff Jancik has no interests antagonistic to the interests of absent class members and there are no conflicts between them. *Id.* ¶ 9. Likewise, class counsel has sufficient qualifications and experience to handle this class action litigation. *See* Ex. 11 (Bursor & Fisher, P.A. Firm Resume).

## III.  THE PROPOSED CLASS AND SUBCLASS SATISFY THE RULE 23(b)(3) REQUIREMENTS

### A.  Predominance

The Eleventh Circuit has established the following principles regarding predominance:

> Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief, but common issues will not predominate over individual questions if, as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues. Moreover, the Rule requires a pragmatic assessment of the entire action and all the issues involved. Determining which type of question predominates requires more of a qualitative than quantitative analysis.

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019) (quotation marks, alterations, and citations omitted).

Here, this case will turn entirely on common issues. Under the VPPA, "[a]

video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief" specified in the statute. 18 U.S.C. § 2710(b)(1). The VPPA defines "personally identifiable information" to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Here, Plaintiff will prove each of these elements with common evidence that will not differ in the slightest from one class member to another. WebMD is either a video tape service provider or it is not. It either knowingly disclosed the PII and video-watching behavior of all Class and Subclass members or none. Class and Subclass members are either all consumers for purposes of the VPPA or none are. And while "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate," *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), here, damages can easily be calculated on a classwide basis, given the VPPA's statutory damages of $2,500. 18 U.S.C. § 2710(c)(2)(A). Accordingly, not only will common issues predominate over individual ones, proving Plaintiff's claim will not involve *any* individual issues.

### B.    Superiority

Federal Rule 23(b)(3) provides that a district court may certify a class if "a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Four non-exhaustive factors

guide the court's inquiry on superiority:

> (A)  the class members' interests in individually controlling the
> prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the controversy
> already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the litigation of the
> claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

*Id.*  "In many respects, the predominance analysis . . . has a tremendous impact on

the superiority analysis . . . for the simple reason that, the more common issues

predominate over individual issues, the more desirable a class action lawsuit will be

as a vehicle for adjudicating the plaintiffs' claims."  *Klay*, 382 F.3d at 1269.

Proceeding as a class action here is superior to hundreds of thousands of

individual cases or joinder.  There is no indication that any Class members have an

interest in controlling the prosecution of this action.  Likewise, there are no other

actions pending that address the same course of conduct.  The Northern District of

Georgia also seems to be the most logical forum for litigating the present claims

because Defendant is located within the forum district.

There are also no meaningful difficulties in managing this case as a class

action.  Identifying class members is particularly simple here because Defendant

already has a list of email subscribers who watched videos.  Ex. 27.  Identifying

members of the Class and Subclass from there will require subpoenaing Meta for information about whether each email address on that list is associated with a Facebook account and has relevant Event Data.  It will be far more efficient to subpoena Meta once instead of hundreds of thousands of times.  In any event, "[a]dministrative feasibility alone will rarely, if ever, be dispositive" of the manageability criterion under Rule 23(b)(3)(D).  *Cherry*, 986 F.3d at 1305.

## IV.   THE PROPOSED CLASS AND SUBCLASS SATISFY RULE 23(b)(2)

Rule 23(b)(2) applies where "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011), the Supreme Court held that claims for monetary relief are excluded from Rule 23(b)(2) when "the monetary relief is not incidental to the injunctive or declaratory relief," or when "each class member would be entitled to an individualized award of monetary damages."  *Id.* at 361.

Here, Plaintiff alleges that Defendant acted on grounds generally applicable to the class: it disclosed the video-watching behavior and PII of every member of the Class and Subclass to Facebook.  While Plaintiff Jancik is seeking monetary relief, she is separately seeking to enjoin Defendant's practice of disclosing video-watching behavior and PII to third parties, including Facebook.  As such, class treatment under Rule 23(b)(2) is appropriate.

20

## CONCLUSION

For the foregoing reasons, this Court should certify the proposed Class and Subclass, appoint Plaintiff as class representative and appoint Plaintiff's counsel as class counsel.

Dated: June 28, 2024                    Respectfully submitted,

*/s/ Joshua D. Arisohn*
Joshua D. Arisohn

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
Alec M. Leslie*
1330 Avenue of the Americas
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
jarisohn@bursor.com
pfraietta@bursor.com
aleslie@bursor.com

H. Clay Barnett, III (GA Bar No. 174058)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
Overlook II
2839 Paces Ferry Road SE, Suite 400
Atlanta, Georgia 30339
Clay.Barnett@Beasleyallen.com

W. Daniel "Dee" Miles, III*
J. Mitch Williams*
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
T: 334-269-2343
Dee.Miles@Beasleyallen.com

21

Mitch.Williams@Beasleyallen.com

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiff*

## **LOCAL RULE 7.1(D) CERTIFICATION**

The undersigned counsel certifies that the foregoing document has been prepared with one of the font and point selections approved by the Court in LR 5.1(B).


Dated:  June 28, 2024                    /s/ Joshua D. Arisohn
                                                   Joshua D. Arisohn (admitted *pro hac vice*)

23