# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| LINDA M. JANCIK, individually and on behalf of all others similarly situated, | CIVIL ACTION |
| Plaintiff, | FILE NO.: 1:22-cv-00644-TWT |
| v. | |
| WEBMD, LLC, | |
| Defendant. | |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

# **TABLE OF CONTENTS**

**PAGE(S)**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

I.    THE CLASS AND SUBCLASS ARE ASCERTAINABLE AND ADEQUATELY DEFINED .........................................................................2

II.   THE CLASS AND SUBCLASS SATISFY THE RULE 23(a) REQUIREMENTS ........................................................................................7

     A.    Plaintiff Jancik Is An Adequate Class Representative And Typical Of The Class And Subclass ........................................................7

     B.    The Class And Subclass Are Sufficiently Numerous ...........................9

III.  THE PROPOSED CLASS AND SUBCLASS SATISFY THE RULE 23(b) REQUIREMENTS ...............................................................................11

     A.    Common Issues Predominate ...............................................................11

     B.    Class Treatment Is Superior To Hundreds Of Thousands Of Individual Actions .................................................................................14

IV.  THE PROPOSED CLASS AND SUBCLASS SATISFY RULE 23(b)(2) ...................................................................................................14

CONCLUSION .....................................................................................................15

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Cordoba v. DIRECTV, LLC*,
 942 F.3d 1259 (11th Cir.) .................................................................................. 13

*DWFII Corp. v. State Farm Mut. Auto Ins. Co.*,
 469 Fed. Appx. 762 (11th Cir. 2012) ................................................................. 15

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
 317 F.R.D. 675 (N.D. Ga. 2016) .......................................................................... 6

*In re Hulu Priv. Litig.*,
 2014 WL 2758598 (N.D. Cal. June 17, 2014) ............................................... 5, 12

*In re Hulu Privacy Litig.*,
 2014 WL 1724344 (N.D. Cal., Apr. 28, 2014) ..................................................... 8

*In re: Facebook Priv. Litig.*,
 2016 WL 4585817 (N.D. Cal. Sept. 2, 2016) ..................................................... 13

*Robinson v. Disney Online*,
 152 F. Supp. 3d 176 (S.D.N.Y. 2015) .................................................................. 8

*Stanton v. NCR Pension Plan*,
 2021 WL 1170109 (N.D. Ga. Mar. 29, 2021) .................................................... 10

*Vega v. T-Mobile USA, Inc.*,
 564 F.3d 1256 (11th Cir. 2009) .......................................................................... 11

*Young v. Nationwide Mut. Ins. Co.*,
 693 F.3d 532 (6th Cir. 2012) ................................................................................ 6

**STATUTES**

18 U.S.C. § 2710(b)(2) ............................................................................................ 15

47 U.S.C. § 227 ....................................................................................................... 13

## INTRODUCTION

This case involves a common course of conduct by Defendant WebMD, LLC ("WebMD" or "Defendant"). Defendant installed the Facebook Tracking Pixel on its website. That computer code tracked what all of its users did on webmd.com, including who they were and what videos they watched, and sent that data to Meta without users' consent. Meta's records show who is in the class because when the data transmissions when through, they were logged as "Event Data."

WebMD grasps at straws in an attempt to demonstrate that, despite these common facts, individual issues will predominate. But its arguments are based on a misunderstanding of how the class will be identified. WebMD has the email addresses of users who subscribe to its newsletter. Meta Platforms, Inc. has testified that it can find Facebook accounts associated with those email addresses. It can also produce Event Data for those accounts showing data that Meta received from webmd.com. When that data contains a webmd.com URL containing the word "video," then the user associated with that Event Data is a class member. If no such data can be found for a specific person, then they are not a class member. This methodology is foolproof and can be carried out on a classwide basis. And, based on Defendant's own estimates, it will result in a Class and Subclass with many thousands of members. Plaintiffs have demonstrated the feasibility of this methodology because they already carried it out for Plaintiff Jancik.

1

Defendant's arguments are also based on a misunderstanding of the evidence. Most notably, Defendant argues that entries in Jancik's Event Data listing the "has_user_pii_data" field as "FALSE" somehow dooms her claim. But that is wrong. The fact that Meta produced Event Data specifically linked to Ms. Jancik shows that Defendant sent Meta not only her video-viewing data, but also information to link that data to her Facebook account.

For all of these reasons, as set out in Plaintiffs' opening brief and below, the Court should certify the Class and Subclass.

## ARGUMENT

### I. THE CLASS AND SUBCLASS ARE ASCERTAINABLE AND ADEQUATELY DEFINED

Defendant argues that the Class is improperly defined because Plaintiff does not explain what it means to have an email address associated with a subscription to webmd.com.[1] Opp'n at 11. It is difficult to fathom what the possible confusion is here. On webmd.com, there is a box on the top right corner of the homepage labeled "Subscribe" with an envelope icon. Ex. 35 (30(b)(6) Dep. Exhibit 11).[2] Once clicked, a box appears stating "Sign up for our free Good Health Newsletter" with a text box instructing users to "Enter your email address" and then a button labeled

---

[1] Defendant also argues that Plaintiff fails to define "accountholder," *id.*, but that term is not part of the Class or Subclass Definition.

[2] Unless otherwise specified, all "Ex. __" citations refer to exhibits attached to the September 27, 2024 Declaration of Joshua D. Arisohn in Support of Reply to Class Certification, submitted herewith.

2

"Subscribe." *Id.* When a user enters their email address into this box and clicks the button, they become a subscriber to WebMD's email newsletter and the email address that they enter ██████████████████████████████. Ex. 36 (30(b)(6) Dep.) at 142:9-143. WebMD not only knows who these subscribers are (it emails them a daily newsletter), but it has records demonstrating whether they watched videos on webmd.com, including by ████████████████████ ████████



> Q. ████████████████████████████████████████
> ████████████████████████████████████████
> ████████████████████████
>
> A. ████████
>
> . . .
>
> Q. ████████████████████████████████████████
> ████████████████████████████████████████
>
> A. ████

*Id.* at 236:9-15, 237:21-24; Ex. 25.

Defendant also argues that Plaintiff fails to set out a workable methodology for determining whether Meta possesses Event Data associated with a WebMD email address. That is incorrect. ████████████████████████ ████████████████████████████████████████████████ Accordingly, for any email address in WebMD's records, ████████████

3

██████████████████████████████████████████

████████████████████████████████ From there, identifying Event Data related to videos is a simple matter of searching for URLs containing the word "video."

Defendant fails to demonstrate that this methodology is not workable. First, it argues that disclosure of the word "video" in a URL, taken alone, is insufficient to demonstrate the disclosure of video-viewing behavior. Opp'n at 13. But WebMD's URLs contain descriptions of the contents of the videos. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

And the URLs can be accessed (clicked on) to view the videos themselves. Defendant's argument in this regard is essentially that a defendant does not violate the VPPA when it sends a complete list of its customers and their video-viewing history to a third party by mail, in an envelope labeled "video viewing history," because the recipient would have to open the envelope to learn its contents. That cannot be right. But in any event, Defendant admits that it used the Facebook Tracking Pixel to send video titles to Facebook. Ex. 3 (Def.'s Responses to Pls.' First Set of Interrogs.) at Response to Interrog. 5 ("The Facebook Pixel discloses to Facebook any url visited on webmd.com. With respect to videos, prior to June 15, 2022, the Facebook Pixel also disclosed **video titles**, button clicks (e.g., play or

4

pause).") (emphasis added).

Citing *In re Hulu Priv. Litig.*, 2014 WL 2758598 (N.D. Cal. June 17, 2014), Defendant next argues that Plaintiff's method for identifying class members is problematic because only a subset of those identified will have suffered an injury. Opp'n at 12. But the methodology for identifying class members in this case is different. In *In re Hulu*, the court noted that cross-referencing email addresses on file with Hulu and those associated with a Facebook account would not be sufficient because matches would not necessarily indicate that video data was actually sent to Meta. *Id.* at *14. Here, on the other hand, the identification of class members is not limited to cross-referencing email addresses, but also includes reference to the Event Data in Meta's possession. If Meta has Event Data showing that a user accessed a video on WebMD (as indicated by the URL using the word "video" like www.webmd.com/hypertension-high-blood-pressure/video/blood-pressure-foods), then that user's video-viewing behavior was shared in violation of the VPPA and they have sustained an injury. The only way Meta could have that data is if WebMD sent it via the Pixel. Accordingly, Meta's possession of Event Data, which was not part of the methodology in *In re Hulu*, is proof positive of an injury.

The feasibility of this methodology has been borne out with the named Plaintiffs. For former Plaintiffs Lebakken, Reeves and Tierno, Meta was not able to find Event Data from WebMD. As such, they are not class members. For Plaintiff

Jancik, on the other hand, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 4. This same process can be accomplished for all of the other emails that WebMD has in its records as well.[3]

WebMD then argues that identifying class members would require an unworkable manual process. Opp'n at 12. But it never explains why that is the case. Regardless, "[t]he fact that some review of files and submissions will be required does not defeat class certification; otherwise, Defendants in this case and others 'could escape class-wide review due solely to the size of their business or the manner in which their business records are maintained.'" *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 693 (N.D. Ga. 2016) (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 540 (6th Cir. 2012)). In any event, for the avoidance of doubt, Plaintiff attaches the Rebuttal Expert Report of Anya Verkhovskaya which explains that identifying class members in the manner that Plaintiff describes is the kind of work that claims administrators routinely undertake. Ex. 39, Verkhovskaya Decl. at ¶¶ 54-57. And such identification can be accomplished through automated processes rather than through manual analysis. *Id.* at ¶ 58.

---

[3] WebMD insists that it "does not have data concerning any individual Website visitor" because its website is "anonymous." Opp'n at 13. That is false. Defendant produced a spreadsheet ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## II. THE CLASS AND SUBCLASS SATISFY THE RULE 23(a) REQUIREMENTS

### A. Plaintiff Jancik Is An Adequate Class Representative And Typical Of The Class And Subclass

Defendant argues that Plaintiff Jancik is not an adequate class representative and is not typical of the Class or Subclass because her Event Data lists "has_user_pii_data" as "FALSE" and she will therefore be subject to a unique defense. Opp'n at 14. Defendant's argument is based on a misunderstanding of the data.

When the Facebook Tracking Pixel sends Event Data to Meta, Meta has different ways to match that data to a specific Facebook user. Under one method, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ When the hosting website sends along its own contact information, the "has_user_pii_data" field is marked as "TRUE." But even when "has_user_pii_data" is marked as "FALSE," that does not mean that Event Data is sent anonymously. To the contrary, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7



A. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌ These Facebook User IDs constitute personally identifiable information ("PII"). *In re Hulu Privacy Litig.*, 2014 WL 1724344 at *14 (N.D. Cal., Apr. 28, 2014) ("[T]he Facebook User ID is more than a unique, anonymous identifier. It personally identified a Facebook user. That it is a string of numbers and letters does not alter the conclusion."); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) ("A Facebook ID, as the *Hulu* court found, is thus equivalent to a name—it stands in for a specific person, unlike a device identifier."). In other words, the "has_user_pii_data" field says nothing about whether WebMD violated the VPPA.

The Event Data for Plaintiff Jancik demonstrates this fact clearly. Each listed event has the same entry listed in column P (hashed_identifier). ▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌ That is why, even though the "has_user_pii_data" field for each of Ms. Jancik's events is listed as "FALSE," ▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ Ex. 38

8

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

In other words, despite the "has_user_pii_data" being labeled "FALSE," ████

███████████████████████████████████████████

████████  Ex. 4.

In addition, because "has_user_pii_data" will likely be marked as "FALSE" for all of the Event Data that Meta received from WebMD, this issue is one that will be the same for the entire class and there is no indication that it presents a unique defense for Plaintiff Jancik.

  **B.**  **The Class And Subclass Are Sufficiently Numerous**

Defendant argues that the Court should deny Plaintiff's motion for class certification because she lacks "any methodology or evidence to meet her burden" of demonstrating numerosity. Opp'n at 16. That is incorrect. It is inconceivable that this Class and Subclass do not include over 40 members each.

As Plaintiffs noted in their opening brief, Defendants own records show ██████ potential members in the Class and ██████ potential members in the Subclass. Br. at 13 (citing Ex. 25). The date range for this data is limited to the calendar years 2021 and 2022, but the Class and Subclass includes most of 2020 as

well as 2023-24[4], so the actual numbers are likely at least twice as large. Given such volumes, numerosity is easily satisfied.

Defendant's argument about the experience of the "plaintiffs in this case" does not serve its point. WebMD's data does not indicate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and so they, and others like them, are already excluded from the class size estimate. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And even if only 1% of the estimated Class actually turn out to be members, there would still be over 11,000 class members, far more than the 40 needed.

Defendant's authorities are not to the contrary. In *Stanton v. NCR Pension Plan*, 2021 WL 1170109, at *7 (N.D. Ga. Mar. 29, 2021), the court denied class certification for lack of numerosity not because the plaintiff used a proxy to estimate class size, but because the proxy used bore no relationship to the class. Specifically, in that ERISA action, the plaintiff relied on a form that disclosed the number of employees who *received* benefits while the case was about employees who had been *denied* benefits. In addition, the form was overinclusive because it was not limited to the 1976 Plan at issue. Here, on the other hand, there is no evidence that Plaintiff's estimates are overinclusive at all. For all ▮▮▮▮▮ potential members of the Class (as well as the ▮▮▮▮ potential members of the Subclass), WebMD has already

---

[4] Webmd.com continues to use the Facebook Tracking Pixel and the Class and Subclass, as defined, both run through the date on which class notice is disseminated.

confirmed that they each watched videos on webmd.com. Because the Facebook Tracking Pixel was running on webmd.com at the time those videos were viewed, the vast majority of those users will be class members.

Likewise, in *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009), the plaintiff presented evidence demonstrating a rough estimate for the nationwide class, but no evidence whatsoever for the Florida subclass. Here, on the other hand, Plaintiff provides estimates not just for the Class, but also separately for the Subclass.

### III. THE PROPOSED CLASS AND SUBCLASS SATISFY THE RULE 23(b) REQUIREMENTS

#### A. Common Issues Predominate

Defendant argues that there will be no common answers in this case because individual issues, such as privacy settings, mean that there is no way to determine if a particular user accessed a video on webmd.com.[5,6] Opp'n at 19. That is incorrect. As explained *supra* at Section I, the Event ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[5] Defendant largely makes the same arguments with respect to commonality and predominance. For simplicity's sake, those arguments are all addressed here.

[6] Defendant's expert witness James Vint likewise opines that "numerous variables" could impact whether Facebook's cookie transmitted a Facebook User ID, such as whether a user was logged into Facebook or whether their browser blocked third-party cookies. But Plaintiff's methodology for identifying class members accounts for such variables. If Meta has Event Data for a particular event, then none of these potential individual factors blocked the transmission.

███████████████████████████████████████████████████ Ex. 4

███████████████████████████████████████████ By using the Event Data itself, privacy settings are irrelevant. If privacy settings had blocked the data from being sent, the Event Data would be empty. But, by looking at the Event Data, we can see not just what data WebMD sent, but also what Meta <u>received</u>. Clearly, if Meta has Event Data, then privacy settings, ad blockers or any other potentially individual factors did not prevent the transmission and receipt of the video-viewing data and class membership is certain.[7]

For this same reason, Defendant's cases are distinguishable. In *In re Hulu*, discussed *supra* at Section I, the court held that cross-referencing Hulu and Facebook email addresses would not resolve individual issues related to whether users were logged into Facebook or cleared or blocked cookies. 2014 WL 2758598, at *22. Here, on the other hand, the Class and Subclass are both defined with reference to whether Meta has the relevant Event Data in its possession, which necessarily means that the potential individual issues did not prevent a given transmission.

---

[7] Defendant asserts that it did not knowingly disclose consumers' video-viewing behavior and PII. Opp'n at 22. That argument has nothing to do with class certification; WebMD either knew across the board that it was making these disclosures to Meta or it did not. There will be no differences between class members. In any event, the record is clear that Defendant knew exactly how the Pixel on its website functioned. Pl.'s Moving Br. (ECF No. 84-1), at 4.

Likewise, in *In re: Facebook Priv. Litig.*, 2016 WL 4585817, at *8 (N.D. Cal. Sept. 2, 2016), predominance was lacking because the plaintiffs failed to provide a methodology for demonstrating violations classwide. The plaintiffs there alleged that when Facebook users clicked on Facebook ads, Facebook sent "referrer headers" to advertisers without their consent. The court held that individual issues would predominate because a number of technical issues often prevented referrer headers from actually being shared. This case is not comparable. Plaintiff's allegations, and her ability to identify class members, are not premised merely on the fact that the pixel was installed on webmd.com. Rather, because the Class and Subclass are defined with reference to the existence of Event Data for specific individuals, there is no doubt about who is in the class and who is not. If Meta has Event Data showing that a particular user watched a particular video on webmd.com, that is absolute proof of a violation because there is no other way that Meta would have that data.

Defendant also cites *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir.) for its argument that standing for each class member will have to be decided on an individual basis. Opp'n at 22-23. In *Cordoba*, the plaintiff alleged that DIRECTV placed calls in violation of the internal do-not-call list regulations promulgated under the Telephone Consumer Protection Act, 47 U.S.C. § 227. But the class definition was overbroad because it included all individuals who received calls from

13

DIRECTV, not just call recipients who asked to no longer receive phone calls. Accordingly, the Court of Appeals held that the class definition was problematic because it necessarily included members who did not sustain an injury. The same cannot be said of this case. Because the definitions of the Class and Subclass turn on whether Meta possesses Event Data showing their video-viewing behavior, there will be no members who did not sustain an injury. Defendant points to Plaintiffs Lebakken, Reeves and Tierno, but they prove Plaintiffs' point: there is no Event Data for them showing violations, and so they are not members of the Class or Subclass. And because the Event Data can be reviewed in a mechanical classwide basis, there will be no individual issues related to standing. Ex. 39, Verkhovskaya Decl. ¶ 58.

### B. Class Treatment Is Superior To Hundreds Of Thousands Of Individual Actions

Defendant argues that Plaintiffs cannot demonstrate that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because individual issues will make this case unmanageable. Opp'n at 24. For the reasons set out above, that is incorrect. Class membership can easily be determined in a classwide manner.

### IV. THE PROPOSED CLASS AND SUBCLASS SATISFY RULE 23(b)(2)

Defendant argues that certification of an injunctive relief class is inappropriate because "monetary damages are not incidental to the requested declaratory relief."

14

Opp'n at 24. That is incorrect. "Monetary damages are incidental when class members automatically would be entitled [to them] once liability to the class . . . as a whole is established[,] and awarding them 'should not entail complex individualized determinations." *DWFII Corp. v. State Farm Mut. Auto Ins. Co.*, 469 Fed. Appx. 762, 765 (11th Cir. 2012). Here, monetary damages are incidental to injunctive relief because the VPPA's statutory damages of $2,500 means that there will be no individual damages determinations. In addition, monetary relief is incidental because, once liability is established, class members will be automatically entitled to damages.[8]

## CONCLUSION

For the foregoing reasons, this Court should certify the proposed Class and Subclass, appoint Plaintiff as class representative and appoint Plaintiff's counsel as class counsel.

Dated: September 27, 2024            Respectfully submitted,

---

[8] Defendant also argues that certification of a Rule 23(b)(2) class is inappropriate because Plaintiff does not specify "what injunctive or declaratory relief is sought or how that would be effectuated." Opp'n at 25. But as the pleadings make clear, Plaintiff seeks WebMD's compliance with the VPPA so that Defendant will no longer share Plaintiff's and class members' video-viewing behavior on webmd.com with third parties. This compliance can take two forms: (1) WebMD can stop using the Facebook tracking pixel and similar technologies on its website, or (2) it can obtain consent that complies with the requirements of the VPPA. While Defendant argues that it already obtains consent, none of its policies mention the Facebook Tacking Pixel or complies with the VPPA's requirements, including that written consent be obtained "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2).

15

/s/ *Joshua D. Arisohn*
  Joshua D. Arisohn

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
Alec M. Leslie*
1330 Avenue of the Americas
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
jarisohn@bursor.com
pfraietta@bursor.com
aleslie@bursor.com

H. Clay Barnett, III (GA Bar No. 174058)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
Overlook II
2839 Paces Ferry Road SE, Suite 400
Atlanta, Georgia 30339
Clay.Barnett@Beasleyallen.com

W. Daniel "Dee" Miles, III*
J. Mitch Williams*
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
T: 334-269-2343
Dee.Miles@Beasleyallen.com
Mitch.Williams@Beasleyallen.com

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiff*

16

## **LOCAL RULE 7.1(D) CERTIFICATION**

The undersigned counsel certifies that the foregoing document has been prepared with one of the font and point selections approved by the Court in LR 5.1(B).

Dated:  September 27, 2024            <u>*/s/ Joshua D. Arisohn*</u>
                                      Joshua D. Arisohn (admitted *pro hac vice*)