IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LINDA M. JANCIK, et al.,

Plaintiffs,

v.

WEBMD LLC,

Defendant.

CIVIL ACTION FILE
NO. 1:22-CV-644-TWT

## OPINION AND ORDER

This is a putative class action case. It is before the Court on Plaintiff Linda M. Jancik's Motion to Certify Class [Doc. 83]. For the reasons set forth below, Plaintiff Jancik's Motion to Certify Class [Doc. 83] is GRANTED.

## I.    Background

Plaintiff Jancik alleges that Defendant WebMD LLC ("WebMD") violated the Video Privacy Protection Act ("VPPA") by improperly disclosing her and other putative class members' personally identifiable information ("PII") to Facebook.[1] (3d Am. Compl. ¶¶ 49–51, 96–101 [Doc. 71]). Specifically, by installing the "Facebook Pixel" tracking tool on webmd.com, WebMD allegedly disclosed the video-viewing activity of its users to Facebook without their consent. (*Id.* ¶¶ 24, 49–51). Jancik seeks four types of relief for her VPPA claim:    (1) declaratory    judgment,    (2) injunctive    and    equitable    relief,

---

[1] The Court notes that it adopts the parties' practice of often using "Facebook" rather than "Meta." Facebook's parent company is Meta.

(3) statutory damages of $2,500 for each Video Privacy Protection Act violation under 18 U.S.C. § 2710(c); and (4) attorney's fees and costs. (*Id.* ¶ 101). The relevant facts are as follows.

WebMD offers online health information through the website webmd.com. (*Id.* ¶ 2). This online information includes both text and video content. (*See id.* ¶ 2). WebMD generates revenue by "sell[ing] advertising space on the videos themselves" and by "harvest[ing] data that sponsors can then leverage for their own products." (*Id.* ¶ 14).

Jancik alleges that WebMD has used the Facebook Pixel since at least 2020. (*See* Br. in Supp. of Pl.'s Mot. to Certify Class, at 4 (quoting Br. in Supp. of Pl.'s Mot. to Certify Class, Ex. 5, 143:25–144:5 [Doc. 84-7])). The Facebook Pixel is a piece of code offered by Meta that a company can install on its website to track the activity of its site visitors. (3d Am. Compl. ¶ 20). The Pixel records information such as the metadata for a webpage that a user visits and a user's button clicks, then transmits that information to Facebook. (*Id.* ¶ 21). Once the data is received, Facebook matches (or attempts to match) the user's activity to a Facebook profile so that WebMD can distribute targeted advertisements to that user on Facebook. (*Id.* ¶¶ 99, 19; *see also id.* ¶¶ 18–19 (describing how this data can also be utilized to send targeted advertisements to those identified as similar to the tracked webmd.com users)).

According to Jancik, WebMD directed the Facebook Pixel to collect and transmit to Facebook information such as the URL of the webpages a user views, users' button clicks on those webpages, and the titles and descriptions of videos on those webpages ("Event Data"). (*Id.* ¶¶ 24–29). For an individual accessing webmd.com on a browser already logged into their Facebook account, the Facebook Pixel automatically transmits a "c_user" cookie to Facebook as well, which includes the user's "Facebook ID." (*Id.* ¶¶ 30, 40, 53). A Facebook ID is a numerical code unique to each Facebook profile, and this c_user cookie is a way that Facebook can directly match a user's Event Data to a Facebook profile. (*Id.* ¶ 53). Further, for an individual accessing webmd.com on a browser already subscribed to WebMD's newsletter, WebMD allegedly directed the Facebook Pixel to additionally transmit the subscriber's email address to Facebook alongside the Event Data—through a process called "Advanced Matching." (*Id.* ¶¶ 45, 47).[2] The addition of a WebMD user's email address helps Facebook match the Event Data to the user's Facebook profile, if one exists. (*Id.* ¶¶ 47–48). Again, once the video-viewing activity of webmd.com users is linked to those users' Facebook profiles, WebMD can send targeted

---

[2] As best the Court can tell, Jancik alleges that WebMD also uploads subscribers' email addresses and certain user activity directly to Facebook through a "Customer List" process that appears independent from the Facebook Pixel. (*Id.* ¶¶ 59–60). Although the full extent and content of this manually transmitted data is not entirely clear to the Court, it appears to allow Facebook to similarly match users' video-viewing activity to their Facebook profiles.

advertisements—related to the video-viewing activity—to those users on Facebook.

Jancik alleges that WebMD's disclosure of its users' video-viewing activity along with their emails and/or Facebook IDs violates the Video Privacy Protection Act. (*Id.* ¶¶ 49–51, 3–6). Beyond certain limited disclosures, the Video Privacy Protection Act provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person . . . ." 18 U.S.C. § 2710(b)(1); *see also id.* § 2710(b)(2)(A)–(F) (listing the circumstances in which a video tape service provider may disclose PII, including disclosing PII "to the consumer," "to any person with the informed, written consent . . . of the consumer," "to any person" for the purpose of marketing to the consumer "if the disclosure is solely of the names and addresses of consumers"). The VPPA defines "personally identifiable information" as "includ[ing] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). A "video tape service provider" includes "any person, engaged in the business, in or affecting interstate . . . commerce, of . . . delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4).

Pending before the Court is Jancik's Motion to Certify Class [Doc. 83].

She proposes the following class (the "Class"):

> All persons in the United States who, from February 17, 2020 through the date on which class notice is disseminated, had the same email address associated with a subscription to webmd.com and a Facebook account, and for whom there is associated Event Data in the possession of Meta Platforms, Inc. showing their video-viewing behavior on webmd.com.

(Br. in Supp. of Mot. to Certify Class, at 11). And she alternatively proposes

the following subclass (the "Subclass"):

> All persons in the United States who, from February 17, 2020 through the date on which class notice is disseminated, had the same email address associated with a newsletter subscription to webmd.com and a Facebook account, and for whom there is associated Event Data in the possession of Meta Platforms, Inc. showing their video-viewing behavior on webmd.com that was accessed through a webmd.com newsletter.

(*Id.* at 11–12).

## II.    Legal Standard

Federal Rule of Civil Procedure 23(c)(1)(A) provides that a court must

"[a]t an early practicable time after a person sues or is sued as a class

representative . . . determine by order whether to certify the action as a class

action." Fed. R. Civ. P. 23(c)(1)(A).

Courts must first assess whether a proposed class is "adequately defined

and clearly ascertainable."[3] *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302

---

[3] Before proceeding to the Rule 23(a)(1)–(4) requirements, courts technically must first determine that a plaintiff has standing to sue. *Fox v. Ritz-Carlton Hotel Co.*, 977 F.3d 1039, 1046 (11th Cir. 2020) (quoting

(11th Cir. 2021) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)). If the class meets this ascertainability requirement, courts must then assess whether the class representatives have satisfied the four requirements outlined in Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Lastly, the proposed class must also satisfy at least one of the alternative requirements in Rule 23(b), which are found in Rules 26(b)(3) and 26(b)(2) for our purposes. *See Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 933 (11th Cir. 2016). A class can be certified under Rule 23(b)(3) if "[1] the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . [2] a class action is

---

*Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)). Here, Jancik has provided records that indicate that WebMD's use of the Facebook Pixel caused her video-viewing behavior (which is associated with her Facebook ID) to be shared with Facebook, and the VPPA likely provides for damages in such instances. (Br. in Supp. of Pl.'s Mot. to Certify Class, at 7–8 (citing Br. in Supp. of Pl.'s Mot. to Certify Class, Ex. 4 [Docs.84-6, 119])). Moreover, with respect to the injunctive and declaratory relief sought, Jancik alleges that she is a Facebook user who continues to "frequently visit[ ] WebMD to . . . watch videos." (3d Am. Compl. ¶¶ 63–64). WebMD does not dispute that Jancik has standing as Named Plaintiff.

superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A class can be certified under Rule 23(b)(2) if a defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The party seeking class certification bears the burden of proving that these requirements are satisfied. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003); *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016) ("[The Plaintiff] must affirmatively demonstrate his compliance with Rule 23 by proving that the requirements are *in fact* satisfied." (quotation marks and citation omitted)). The decision to grant or deny class certification lies within the sound discretion of the district court. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1386 (11th Cir. 1998) (en banc). When considering the propriety of class certification, the court should not conduct a detailed evaluation of the merits of the suit. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974). Nevertheless, the court must perform a "rigorous analysis" of the particular facts and arguments asserted in support of class certification. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161

(1982); *Gilchrist v. Bolger*, 733 F.2d 1551, 1555 (11th Cir. 1984). Frequently, that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351–52 (2011).

### III.    Discussion

Ultimately, the Court grants Jancik's Motion with respect to the proposed Class. Because the proposed Class meets all class certification requirements and Jancik appears to have proposed the Subclass only as an alternative to certifying the proposed Class, the Court declines to rule on the proposed Subclass. The Court discusses the Rule 23(a), Rule 23(b)(3), and Rule 23(b)(2) requirements in turn below.

### A. Rule 23(a)

#### 1.  Class Definition and Ascertainability

Before the Court can turn to the rest of the Rule 23(a) requirements, it must determine whether the proposed Class is "adequately defined and clearly ascertainable." *Cherry*, 986 F.3d at 1302 (quoting *Little*, 691 F.3d at 1304); *see also id.* at 1302–03 ("[A]scertainability . . . is an implied prerequisite to the requirements of Rule 23(a)."). The Eleventh Circuit has traditionally treated the class definition and ascertainability prongs as a single inquiry, explaining: "[A] proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Id.* at 1304. A class definition cannot

be adequate if it relies on "vague or subjective criteria." *Id.* at 1302. In the Eleventh Circuit, proof of administrative feasibility is not a requirement of nor in any way "part of" the ascertainability analysis (though it is a factor the Court may consider in its separate Rule 23(b)(3) analysis). *Id.* at 1303; *see also id.* at 1304 ("[A]side from its limited relevance to Rule 23(b)(3)(D), administrative feasibility is entirely unrelated to either Rule 23(a) or (b).").

Here, the Court concludes that the proposed Class is "adequately defined and clearly ascertainable." *See id.* at 1302 (quoting *Little*, 691 F.3d at 1304). The Court agrees with Jancik that the proposed Class is specific and relies on criteria that can be objectively determined, and that is sufficient to satisfy this requirement. As the Court understands it, Jancik proposes to (1) obtain records from both WebMD and Facebook and then (2) analyze these records to ultimately identify the proposed Class. (Reply Br. in Supp. of Pl.'s Mot. to Certify Class, at 1 [Doc. 95]). She explains that WebMD possesses the list of its newsletter subscribers' email addresses and that Facebook possesses—as a result of the Facebook Pixel—Event Data associated with those email addresses. (Br. in Supp. of Pl.'s Mot. to Certify Class, at 19–20 [Doc. 83-1]). According to Jancik, Meta has testified that it can determine if there is a Facebook account associated with a given email address, and it has also shown that it can produce webmd.com Event Data once a Facebook account has been identified—as was the case for Event Data produced by Meta

for Plaintiff Jancik. (*Id.* at 1, 19–20). Jancik argues that the Event Data will clearly and objectively indicate whether a WebMD subscriber viewed a video because it will include the URL that the subscriber visited and the URL will include the word "video" to indicate the page is a video. (*Id.* at 3). As an example, Jancik points to the Event Data that Facebook produced for herself, which shows that she visited "www.webmd.com/hypertension-high-blood-pressure/video/blood-pressure-foods." (*Id.*). The URL includes only a video about high blood pressure and a corresponding transcript. Jancik's expert report further states that identifying videos viewed from Event Data tables produced by Meta could be analyzed through an automated or batch process, with quality assurance checks.[4] (Reply Br. in Supp. of Pl.'s Mot. to Certify Class, Ex. 39 ("Verkhovskaya Report") ¶¶ 57–58 [Doc. 96-9]).

---

[4] In its Sur-Reply, WebMD asks the Court to exclude from evidence Anya Verkhovskaya's expert report under *Daubert*. (Def.'s Reply Br. in Opp'n to Pl.'s Mot. to Certify Class, at 8–9). The Court ultimately concludes that Verkhovskaya's report should not be excluded. The relevant underlying facts—that Meta can associate an email address with a Facebook account and that Meta has produced Event Data for Plaintiff Jancik from her Facebook ID—appear to be true based on the deposition of witness Tobias Wooldridge [Doc. 96-7] and Plaintiff Jancik's produced Event Data [Doc. 4]. In other words, these facts appear true independent of Verkhovskaya's report. It seems that Verkhovskaya's report summarizes these facts and then states that, as a result of her prior experience with ".SQL staging tables," she believes that sifting through the Event Data tables could be done in a batch or automated process (with quality assurance checks). (Verkhovskaya Report ¶¶ 49, 58). Verkhovskaya has demonstrated that her methodology in this regard would be adequate and reliable. (*See id.* ¶¶ 46–53). Therefore, the Court declines to exclude Verkhovskaya's report at this time.

WebMD argues that the proposed Class is not adequately defined or ascertainable for several reasons, but the Court finds these arguments unavailing at this time. WebMD first argues that the proposed Class is not "adequately defined" because it does not define the phrase "subscription to webmd.com." (Def.'s Resp. Br. in Opp'n to Pl.'s Mot. to Certify Class, at 11 [Doc. 92]). The Court, however, agrees with Jancik that "[i]t is difficult to fathom what the possible confusion is," as there is clearly a button on webmd.com where users can "subscribe" to WebMD's newsletter using their email address. (Reply Br. in Supp. of Pl.'s Mot. to Certify Class, at 2–3; *id.*, Ex. 35, at 1 [Doc. 96-5]). As Jancik explains, "[w]hen a user enters their email address into this box and clicks the button, they become a subscriber to WebMD's email newsletter and the email address that they enter is associated with a subscription to webmd.com." (Reply Br. in Supp. of Pl.'s Mot. to Certify Class, at 3 (citation omitted)).

WebMD next argues that Jancik's proposal to rely on Facebook to identify Event Data based on email addresses is "untested and insufficient." (Def.'s Sur-Reply in Opp'n to Pl.'s Mot. to Certify Class, at 2 [Doc. 123]). It asserts that it "is not aware of any case where Meta provided such data on a class basis" and that the testimony offered by Jancik to the contrary is "overstated" and too "vague." (*Id.* at 2–3 & 3 n.1). To be clear, Jancik offered the following testimony from Tobias Woolridge:

Q: [ ] So assuming they are a Facebook user, can Meta use someone's email address that they have on record with their account to find their Facebook user ID?

. . .

[A]: I suspect that that would be possible.

. . .

Q: . . . You testified a moment ago that you can use an email address to locate a Facebook ID. Do you recall that testimony?

A: I believe that you can probably do that.

(Reply Br. in Supp. of Pl.'s Mot. to Certify Class, Ex. 37 ("Woolridge Dep."), at 221:11–222:10 [Doc. 96-7]). As of the date of his testimony, Tobias Woolridge was a senior software engineer on Meta's Signals team, "which bears primary responsibility for maintaining and updating the Meta Pixel code." (Br. in Supp. of Pl.'s Mot. to Certify Class, Ex. 2, ¶ 1 [Doc. 84-4]).

Here, Jancik has offered testimony directly from Meta affirming that Meta "probably" can "use an email address to locate a Facebook ID," and thus locate the webmd.com Event Data associated with that Facebook ID. (*See* Woolridge Dep. at 222:7–10). WebMD has not offered testimony to the contrary; rather, WebMD appears to merely assert that "probably" is not good enough without additional proof or details. (*See* Def.'s Sur-Reply in Opp'n to Pl.'s Mot. to Certify, at 2–4). Although Woolridge's testimony is not a definitive account of Facebook's capabilities, the Court finds it sufficient to satisfy Jancik's burden with respect to whether the proposed Class is capable of being determined and thus ascertainable. The Court is especially comfortable with this finding amid Jancik's other allegations and evidence that show companies

use Facebook's advertising tools and capabilities precisely because Facebook can supposedly match data such as email addresses to an individual's Facebook profile and that Facebook advertises itself in this way. (*See, e.g.*, 3d Am. Compl. ¶¶ 47–48, 58–60 (referring to Facebook's own descriptions of its advertising tools)).

Lastly, WebMD argues that the proposed Class cannot be ascertained because Jancik's proposed method "fails to account" for the following possibilities, which would require individualized proof to overcome: "intended video content was never added to a URL"; "video content was added, but inaccessible at the time visited"; "the video was removed before the user visited"; or the person accessing the video is different from the owner of the account or device tracked. (Def.'s Sur-Reply in Opp'n to Pl.'s Mot. to Certify Class, at 4–6). As an initial matter, the Court notes that these concerns would appear to veer toward the realm of administrative feasibility, which is not a factor or requirement in the present ascertainability inquiry. But, nonetheless, the Court concludes that WebMD's concerns appear entirely speculative at this point in time and do not defeat the ascertainability of the Class. *See Rivera v. Equifax Info. Servs., LLC*, 341 F.R.D. 328, 345 (N.D. Ga. 2022) ("[The Defendant's] arguments about an overbroad class are based on speculation. And where the potential that some number of individuals [are not actually claimants] is hypothetical, courts should not allow such 'speculation and

13

surmise to tip the decisional scales' against class certification."). WebMD does not point to any instances in which its concerns became a reality nor does it point to any evidence regarding these concerns being anything more than exceedingly rare potential exceptions. Plainly, the idea that class certification should be denied merely due to a possibility at this stage that a website gave a 404 error or a family member used someone else's computer seems absurd. Moreover, it does not seem unreasonable that a claims process could be fashioned to help further verify whether a claimant meets the Class criteria, in addition to using the Event Data gathered by WebMD and Facebook. Should the proposed Class prove to be unascertainable in the future, however, WebMD may move to de-certify the Class. Therefore, given all the above, the Court finds that the proposed Class satisfies the ascertainability requirement.

### 2. Numerosity

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Whether joinder is impracticable "depends on many factors, including, for example, the size of the class, ease of identifying its members and determining their addresses, facility of making service on them if joined and their geographic dispersion." *J.M. ex rel. Lewis v. Crittenden*, 337 F.R.D. 434, 447 (N.D. Ga. 2019) (quoting *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986)). Mere numbers are not outcome determinative, but courts generally presume a class containing more

than forty members satisfies the numerosity requirement. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). "When the exact number of class members cannot be ascertained, the court may make 'common sense assumptions' to support a finding of numerosity." *Susan J. v. Riley*, 254 F.R.D. 439, 458 (M.D. Ala. 2008) (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983)); *see also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009) (finding that, while a plaintiff "need not show the precise number of members in the class," the plaintiff must "bear[ ] burden of making *some* showing . . . that the class actually certified meets the numerosity requirement." (citation omitted)). If the numerosity inquiry remains a close call, "a balance should be struck in favor of a finding of numerosity, since the court has the option to decertify pursuant to Rule 23(c)(1)." *Crittenden*, 337 F.R.D. at 447 (quoting *Evans*, 696 F.2d at 930).

Based on WebMD's records, Jancik has identified at least 550,213 email addresses corresponding to newsletter subscribers "associated with videos accessed on webmd.com" (relevant to the Class), and she has identified at least 269,189 email addresses "associated with videos accessed on webmd.com by clicking through newsletter links specifically" (relevant to the Subclass). (Br. in Supp. of Pl.'s Mot. to Certify Class, at 13 (citing Br. in Supp. of Pl.'s Mot. to Certify Class, Ex. 25)). These numbers reflect data from 2021 and 2022 alone, though the Class includes parts of 2020, 2023, and 2024. (Reply Br. in Supp. of

15

Pl.'s Mot. to Certify Class, at 9–10). According to Jancik, "WebMD's use of the Pixel means that it sent all of this data to Meta," and numerosity is thus readily met. (Br. in Supp. of Pl.'s Mot. to Certify Class, at 14).

WebMD disputes whether the numerosity requirement is met, relying on *Martinez v. D2C, LLC* to show that a district court rejected almost "identical" arguments to those presented by Jancik. (*See* Def.'s Sur-Reply Br. in Opp'n to Pl.'s Mot. to Certify Class, at 10 (citing *Martinez v. D2C, LLC*, 2024 WL 4367406 (S.D. Fla. Oct. 1, 2024)); *see also* Def.'s Resp. Br. in Opp'n to Pl.'s Mot. to Certify Class, at 17 (arguing similarly that Jancik's numerosity argument relies on "sheer speculation")). WebMD makes two primary arguments in this regard. First, WebMD argues that it would be "mere speculation," as in *Martinez*, to conclude that the Class is sufficiently numerous based on the assumption that the "mere presence of the Meta Pixel on [WebMD's] website resulted in the transmission of tens of thousands of [WebMD] subscribers' personally identifiable information from [WebMD] to Meta." (*See* Def.'s Sur-Reply Br. in Opp'n to Pl.'s Mot. to Certify Class, at 10–11 (alterations in original) (quoting *Martinez*, 2024 WL 4367406, at *6)). The *Martinez* court stated that the plaintiff's estimates of the number of newsletter subscribers who viewed certain videos "t[old] the Court nothing" about the percentage of those viewers were "were also *logged in to* their own Facebook accounts, through the *same browser*, and on the *same device* on which they

16

viewed [the] video[s]." *Martinez*, 2024 WL 4367406, at *7. That percentage could theoretically be so high, according to the reasoning in *Martinez*, that the Class may not be numerous. Second, WebMD argues that a showing that one plaintiff's Event Data was shared with Facebook, as is the case here and was the case in *Martinez*, is not sufficient for a court to infer numerosity. (Def.'s Sur-Reply Br. in Opp'n to Pl.'s Mot. to Certify Class, at 11).

The Court concludes that Jancik has carried her burden of showing numerosity. Based on the evidence provided by the parties, "common sense" suggests that the Class far, far exceeds the forty-person benchmark. *See Riley*, 254 F.R.D. at 458 (quoting *Evans*, 696 F.2d at 930). Jancik has shown through WebMD's records that there are at least 550,213 unique subscriber emails with video-viewing activity on webmd.com. (Br. in Supp. of Pl.'s Mot. to Certify Class, at 13). Although the number of individuals who ultimately had a Facebook account and had their PII shared will be smaller than this 550,213 figure due to certain user settings, the proffered evidence is sufficient for this Court to make the reasonable inference that the proposed Class is numerous. There will inevitably be some unknowns in estimating class size when the Plaintiff cannot yet possess the records critical to determining the actual size, but it seems unreasonable to conclude at this stage that numerosity is unmet. Once Meta is subpoenaed, it appears that the actual number of Class members can be determined relatively quickly. The Court anticipates this number will

be quite large and likely numbering at least in the tens of thousands. Other courts have reached findings of numerosity with seemingly similar unknowns.[5] *See, e.g.*, *Drossin v. Nat'l Action Fin. Servs., Inc.*, 255 F.R.D. 608, 615 (S.D. Fla. 2009) (finding numerosity met based on a "reasonable estimate" of the number of potential class members who received a certain message over the phone, though the Court recognized some unknown number of individuals would not have heard the message due to not answering the phone, hanging up the phone, or other reasons); *Bouton v. Ocean Props., Ltd.*, 322 F.R.D. 683, 697 (S.D. Fla. 2017) (finding numerosity met where the plaintiff showed that the universe of potential class members totaled approximately 5,000, though the actual number would be limited—to an unknown extent—to those "who requested a folio at the front desk").

Moreover, the facts of the present case support a stronger case for numerosity compared to those presented in *Martinez* for two additional reasons. For one, the starting number of subscribers who viewed a relevant

---

[5] The Court additionally notes that the case underlying the reasoning in *Martinez*, *Vega*, 654 F.3d 1256, merely found that it was impermissible to find numerosity where (1) a proposed class included T-Mobile sales associates in Florida who experienced certain problems with receiving their commissions but where (2) the plaintiffs had only provided testimony that T-Mobile sales associates across the country numbered "in the thousands." *Id.* at 1264, 1267. The *Vega* court suggested that the plaintiffs needed to at least make a showing of the number of T-Mobile sales associates *in Florida* (even if data was not available on the number of associates who experienced problems with their commission). *See id.* at 1268. That required showing was indeed a low bar.

18

video in *Martinez* (35,845), 2024 WL 436740, at *6, was substantially smaller than in the present case (550,213), (Br. in Supp. of Pl.'s Mot. to Certify Class, at 13), making it more likely that this proposed Class is in fact numerous. Second, the fact that WebMD directed the Facebook Pixel to transmit subscribers' email addresses along with their Event Data helps alleviate three of the six unknown variables that were at issue in *Martinez*. The *Martinez* court found that PII was not transmitted to Facebook if subscribers who viewed a video were not simultaneously (1) logged into their own Facebook accounts on the same (2) device and (3) browser. *Martinez*, 2024 WL 4367406, at *7–8. But, here, WebMD appears to have utilized an "Advanced Matching" process in which Facebook may still have associated Event Data with individual Facebook profiles—based on the email addresses WebMD provided—even if the user was never logged into Facebook. (*See* Br. in Supp. of Pl.'s Mot. to Certify Class, at 3; Reply Br. in Supp. of Pl.'s Mot. to Certify Class, at 7). This assuages the Court's concern that presently unknown variables could reduce the Class size so immensely.

The Court is persuaded that joinder is further made impracticable due to the anticipated geographic diversity of the proposed Class—given that anyone across the country can access WebMD's website—and the ability to achieve seemingly significant judicial economy with a class action—given joinder may likely require individually subpoenaing Meta for each

subsequently joined plaintiff. *See Crittenden*, 337 F.R.D. at 447 (quoting *Kilgo*, 789 F.2d at 878); *Amos v. Advanced Funding, Inc.*, 2007 WL 9701551, at *5 (N.D. Ga. Jan. 16, 2007) (quoting *Johnson v. Montgomery Cnty. Sheriff's Dep't*, 99 F.R.D. 562, 564 (M.D. Ala. 1983) (regarding "judicial economy" as a "key" factor)). The Court notes that it appears neither of these factors were considered by the *Martinez* court.

Lastly, the Eleventh Circuit has instructed courts to strike a balance "in favor of" numerosity since the parties can always move to de-certify the class later. *See Crittenden*, 337 F.R.D. at 447 (quoting *Evans*, 696 F.2d at 930). In the highly unusual circumstance that the records produce very few actual Class members, the Court could consider a motion to de-certify the Class. But at this class certification stage, the Court is comfortable concluding that Jancik has made a sufficient showing of numerosity.

### 3. Commonality

A proposed class satisfies the commonality requirement if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The claims of the proposed Class "must depend upon a common contention . . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350; *see also id.* ("What matters . . . is . . . the capacity of a class-wide proceeding to

generate common *answers* apt to drive the resolution of the litigation." (citation omitted)). Rule 23(a)(2) is a "low hurdle," *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009), and a plaintiff need only show that one common contention exists, *id.* at 1355 ("Commonality requires 'that there be at least one issue whose resolution will affect all or a significant number of the putative class members.'" (citation omitted)).

Here, it is clear that at least one common contention exists regarding all class members, including (1) whether the Facebook Pixel disclosed video-viewing behavior to Facebook, (2) whether that behavior or any other data constitutes PII, and (3) whether class members consent to those disclosures under the terms of the Video Privacy Protection Act. (*See* Br. in Supp. of Pl.'s Mot. to Certify Class, at 15). Litigating a class action suit would produce common answers to these questions, and each of these answers will "drive the resolution of the litigation" and "affect all . . . putative class members." *See Wal-Mart*, 564 U.S. at 350; *Williams*, 568 F.3d at 1355.

WebMD argues that "individual differences such as privacy settings, device usage, and account sharing . . . impede the generation of common answers. (Def.'s Resp. Br. in Opp'n to Pl.'s Mot. to Certify Class, at 20; *see also id.* ("Plaintiff's claims will require an individualized inquiry; thus, certification must be denied for lack of commonality.")). However, the Court agrees with Jancik that the proposed Class is "defined with reference to whether Meta has

the relevant Event Data in its possession." (Reply Br. in Supp. of Pl.'s Mot. to Certify, at 12). It thus does not matter whether an individual had a specific privacy, cookie, or other setting that blocked the Facebook Pixel from automatically transmitting Event Data to Facebook because the Class is limited in scope to only those individuals for which Facebook has available Event Data. (*Id.*; *see also id.* at 13 ("If Meta has Event Data showing that a particular user watched a particular video on webmd.com, that is absolute proof of a violation because there is no other way that Meta would have that data.")). In other words, Jancik's proposed class definition appears to circumvent the issues raised by WebMD regarding commonality. Therefore, the Court finds the commonality requirement met.

### 4. Typicality

"The claim of a class representative is typical if 'the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Williams*, 568 F.3d at 1357 (citation omitted). "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)." *Id.* (quoting *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001)).

Here, the claims of named Plaintiff Jancik are clearly typical of the proposed Class. Just like other class members, Jancik supposedly "watched

22

videos on webmd.com" during the relevant time period, and WebMD used the Facebook Pixel to collect her video-viewing activity and other PII and transmit that data to Facebook. (Br. in Supp. of Pl.'s Mot. to Certify Class, at 16). Thus, Jancik's claims "are based on the same legal theory" as the proposed Class as a whole. *See Williams*, 568 F.3d at 1357.

WebMD contends that Jancik is not in the "same shoes" as other class members because "no PII about Plaintiff was transferred from the Website" to Facebook. (Def.'s Resp. Br. in Opp'n to Pl.'s Mot. to Certify Class, at 15). To support this contention, WebMD points to rows in Jancik's Event Data that note "0" and "FALSE" for a column with the label "has_user_PII_data." (*Id.*). However, as Jancik points out, WebMD misunderstands the "has_user_PII_data" column. (Reply Br. in Supp. of Pl.'s Mot. to Certify Class, at 7). To the best of the Court's understanding, the output in the "has_user_PII_data" column depends on how the Event Data is matched to a Facebook profile, not on whether WebMD disclosed PII for that user. (*Id.* at 7 (further explaining the intricacies of the "has_user_PII_data" column")). Without diving too far into the specifics of this data point, the Court finds it sufficient to note that Facebook was able to produce Plaintiff Jancik's Event Data despite the "0" and "FALSE" values for her "has_user_PII_data" column, thus appearing to moot WebMD's concern that none of Jancik's PII was shared to Facebook. (*Id.*)

23

WebMD additionally contends that Plaintiff Jancik is not typical because Facebook produced her Event Data based on Jancik's Facebook ID while Facebook would supposedly produce the Event Data of other class members based on class members' email addresses. Because WebMD has not shown why the difference is significant—other than as already addressed above—the Court does not find this argument persuasive. Given all the above, the Court thus finds that Plaintiff Jancik is typical of the proposed Class.

### 5. Adequacy

The adequacy requirement tests "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Doe v. MG Freesites, LTD*, 707 F. Supp. 3d 1157, 1174 (N.D. Ala. 2023) (quoting *Valley Drug*, 350 F.3d at 1189).

Beyond arguing that proposed Class Counsel is inadequate because it represents a class member that is atypical, WebMD does not dispute the competency of proposed Class Counsel. Therefore, because the Court has already found that Plaintiff Jancik is typical of the proposed Class, the Court is not aware of any other reason why proposed Class Counsel would not adequately represent the interests of the class. And, after further review of the parties' briefs and the firm resume of proposed Class Counsel [Doc. 84-13], the Court agrees that (1) there appear to be no "substantial" (or any) conflicts of

interest between Plaintiff Jancik and the other class members and (2) Class Counsel has demonstrated it has sufficient qualifications to "adequately prosecute" this case. *MG Freesites*, 707 F. Supp. 3d at 1174 (quoting *Valley Drug*, 350 F.3d at 1189).

## B. Rule 23(b)(3)

To certify a class under Rule 23(b)(3), a plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) identifies four factors relevant to this inquiry: (a) "class members' interests in individually controlling the prosecution or defense of separate actions"; (b) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (c) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (d) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D). As part of the analysis on "managing" class actions, courts must consider administrative feasibility. *Cherry*, 986 F.3d at 1303–04. But plaintiffs need not prove administrative feasibility "in an absolute sense"; rather, "[t]he manageability inquiry focuses on whether a class action 'will create relatively more management problems than any of the alternatives." *Id.* at 1304 (citing *Klay*,

382 F.3d at 1273).

The Court holds that Jancik has shown predominance and superiority. Regarding predominance, the Court agrees that Jancik will use "common evidence that will not differ in the slightest from one class member to another" in proving each element of the VPPA claim. (Br. in Supp. of Pl.'s Mot. to Certify Class, at 18). The elements include whether webmd.com subscribers are "consumers," WebMD is a "video tape service provider," the type of data transmitted constitutes "personally identifiable information," WebMD "knowingly disclosed" such data, and WebMD obtained "informed, written consent." *See* 18 U.S.C. §§ 2710(a)(1), 2710(a)(3)–(4), 2710(b)(1)–(2). Moreover, as Jancik explains, the VPPA provides for statutory damages of $2,500, further easing the question of individualized damages. *See id.* § 2710(c). WebMD attempts to argue that a "manual, individualized review" of each potential Class member's data will be necessary, (*see* Def.'s Resp. Br. in Opp'n to Pl.'s Mot. to Certify Class, at 22; Def.'s Sur-Reply in Opp'n to Pl.'s Mot. to Certify Class, at 12), but the Court disagrees. As explained above in the ascertainability section, the production of Event Data anticipated from Meta should clearly reveal the individuals from which Meta received video-viewing data (accounting for device, browser, and other settings). (Reply Br. in Supp. of Pl.'s Mot. to Certify Class, at 11–12 & 11 n.6). And a class action administrator can take care of any further quality assurance checks (e.g.,

whether a video embedded on a webpage loads an error message) and claims process verifications.

Regarding superiority, the Court agrees that "a class action here is superior to hundreds of thousands of individual cases or joinder." (Br. in Supp. of Pl.'s Mot. to Certify Class, at 19). Thus far, no class members have expressed interest in litigating this case through separate actions; no other pending cases appear to address the current controversy; no one has suggested that Georgia, being where WebMD is located, is an inappropriate forum; and no significant manageability concerns appear to outweigh the manageability concerns that would exist if this case was litigated through separate actions. (*Id.* at 19–20). WebMD argues that "class treatment is not superior, because . . . each putative class member would need to individually prove that his or her PII was captured and shared with Meta." (Resp. Br. in Opp'n to Pl.'s Mot. to Certify Class, at 24; *see also* Def.'s Sur-Reply Br. in Opp'n to Pl.'s Mot. to Certify Class, at 13 (asserting same)). For the same reasons discussed above, that argument is unavailing. Therefore, the Court hereby certifies the proposed Class under Rule 23(b)(3).

## C. Rule 23(b)(2)

Although the Court has held that certification under Rule 23(b)(3) is appropriate, Jancik may seek certification under Rule 232(b)(2) as well. *Wal-Mart*, 564 U.S. 360. Rule 23(b)(2) certification is available if WebMD "has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "A declaratory or injunctive relief class pursuant to Rule 23(b)(2) is appropriate only if 'the predominant relief sought is injunctive or declaratory.'" *DWFII Corp. v. State Farm Mut. Auto Ins. Co.*, 469 F. App'x 762, 765 (11th Cir. 2012) (quoting *Murray*, 244 F.3d at 812 (citation omitted)). The monetary relief must be *incidental* to the injunctive or declaratory relief. *See Murray*, 244 F.3d at 812 (citation omitted)). "Monetary damages are incidental when 'class members automatically would be entitled [to them] once liability to the class . . . as a whole is established[,]' and awarding them 'should not entail complex individualized determinations.'" *DWFII Corp.*, 469 Fed. App'x at 765 (alterations in original) (quoting *Murray*, 244 F.3d at 812).

Here, Jancik seeks an injunction "as is necessary to protect the interests of Plaintiffs and the Class by requiring [WebMD] to comply with VPPA's requirements for protecting a consumer's PII" and a declaration that WebMD's conduct violates the VPPA. (3d Am. Compl. ¶ 101). Jancik argues that any monetary damages sought would be "incidental" due to the $2,500 statutory damages required by the VPPA. (Br. in Supp. of Pl.'s Mot. to Certify Class, at 20). WebMD argues that Jancik's request is "vague on what injunctive or declaratory relief is sought or how that would be effectuated." (Def.'s Resp. Br.

in Opp'n to Pl.'s Mot. to Certify Class, at 25). It also argues that enjoining WebMD is unnecessary because webmd.com visitors are the ones who "primarily" control whether their data is shared; they can, for example, opt out of subscriptions; adjust device, browser, or Facebook settings; or deactivate their Facebook accounts. (*Id.*; Def.'s Sur-Reply Br. in Opp'n to Pl.'s Mot. to Certify Class, at 13–14; *see also id.* at 14 (suggesting an injunction would intrude on subscribers who consented to the sharing of their PII)). The Court addresses these arguments below.

The Court agrees with Jancik that certification under Rule 23(b)(2) is appropriate. The Court does not find Jancik's request for declaratory or injunctive relief overly vague. As Jancik explains, WebMD is still supposedly using the Facebook Pixel in a way that may violate the VPPA, (Reply Br. in Supp. of Pl.'s Mot. to Certify Class, at 10 n.4), and WebMD could be enjoined to either stop using the Pixel in this violative manner or to obtain informed consent compliant with the VPPA, (*id.* at 15 n.8). Additionally, Jancik has shown that monetary damage can be fairly characterized as "incidental" under the Eleventh Circuit's description. Class members would "automatically" be entitled to $2,500 in statutory damages "once liability to the class . . . as a whole is established." *DWFII Corp.*, 469 Fed. App'x at 765 (quoting *Murray*, 244 F.3d at 812). And the $2,500 figure set by the VPPA means that "there will be no individual damage determinations." (Reply Br. in Supp. of Pl.'s Mot. to

Certify Class, at 15; *see also id.* (citing *DWFII Corp.*, 469 Fed. App'x at 765 (stating that awarding damages in a Rule 23(b)(2) class may "not entail complex individualized" damage determinations)). Additionally, the Court is not convinced by WebMD's arguments that injunctive relief is unnecessary since individual Class members could adjust their personalized settings. WebMD cites no authorities regarding the relevance or importance of this fact, and it does not appear particularly relevant given that an injunction could potentially remedy WebMD's continued use of the Facebook Pixel "for the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). Therefore, the Court hereby certifies the proposed Class under Rule 23(b)(2).

### D. Class Representative and Class Counsel

The Court hereby appoints Plaintiff Linda M. Jancik as Class Representative. According to Rule 23(g)(1), the Court must also appoint Class Counsel. Fed. R. Civ. P. 23(g)(1). Plaintiff's counsel satisfies the adequacy requirement of Rule 23(a)(4), and the firm's resume otherwise supports a finding that Plaintiff's counsel possesses the experience, knowledge, and financial resources to adequately and fairly represent the interests of both the named Plaintiff and the Class. *See* Fed. R. Civ. P. 23(b)(1)(A). Therefore, the Court appoints Plaintiff's counsel as Class Counsel in this case.

## IV.    Conclusion

For the foregoing reasons, Plaintiff Linda M. Jancik's Motion to Certify Class [Doc. 83] is GRANTED. The Court appoints Plaintiff Jancik as Class Representative and Plaintiff's counsel as Class Counsel.

SO ORDERED, this ____20th____ day of February, 2025.

THOMAS W. THRASH, JR.
United States District Judge